## STATE of Maine

### v.

### Richard STEEVES.

Supreme Judicial Court of Maine.

April 5, 1978.

Michael D. Seitzinger (orally), Charles K. Leadbetter, Asst. Attys. Gen., Augusta, James R. Erwin, Law Student, for plaintiff.

Daniel G. Lilley, Portland (orally), Wayne E. Murray, Somersworth, N. H., for defendant.

Before POMEROY, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

NICHOLS, Justice.

On February 3, 1966, a grand jury in Kennebec County returned an indictment charging the Defendant with the August, 1965, murder of Lorenzo Troyer. For reasons discussed below, he has never been brought to trial on that charge. This case comes here on report pursuant to Rule 37A(a), M.R.Cr.P., for our determination of whether the Defendant has been denied his constitutional right to a speedy trial and whether his motion to dismiss this indictment should be granted.

We remand to the Superior Court with directions to grant that motion.

From the record,[1] it appears that Lorenzo Troyer died in an Augusta Hospital on August 15, 1965 after being discovered at home the day previous suffering from head injuries consistent with a beating by a blunt object. Police conducted an investigation and followed several leads, but no arrests resulted.

1. Before reporting the case, the presiding justice conducted an evidentiary hearing into the circumstances surrounding the delay, thus creating the factual record necessary for our determination.

On January 5, 1966, the Defendant was picked up by the Manchester, New Hampshire police on an unrelated matter involving a car allegedly stolen in Ohio. During the course of interrogation, he allegedly confessed to five murders, including the Troyer murder, a murder in New Hampshire, two murders in Ohio, and another murder in Maine.[2]

On January 16, 1967, the Defendant was adjudged not guilty by reason of insanity on the New Hampshire murder charge, and was committed to the New Hampshire State Prison for life "until or unless earlier discharged, released or transferred by due course of law." The Maine Attorney General was promptly notified by New Hampshire authorities of this disposition.

The Defendant remained in the New Hampshire State Prison until December, 1971, when he was transferred to Ohio for trial on two murder charges there. On June 14, 1972, the Defendant entered a plea of not guilty by reason of insanity to those charges. The Ohio court accepted that plea and committed him to the Lima State Hospital, such commitment to begin if and when he was released from custody in New Hampshire. The Defendant was then returned to New Hampshire.

In October, 1972, the Maine Attorney General's office apparently reviewed their file on this matter and concluded that the " . . . case should be recalled annually in order that Mr. Steeves' status be checked. If he should ever be released from custody, Maine should proceed with trial."

In October, 1973, the County Attorney of Kennebec County wrote to the Attorney General's office for " . . . a determination of what your intentions are with respect to this case. As far as we know he is still incarcerated and if we are going to try it (sic) the near future would seem the best time." [3]

An internal memorandum dated November 20, 1973 indicates that an Assistant Attorney General spoke with New Hampshire prison officials and determined that Defendant had no petition or order for his release pending. This memorandum concluded, "Do you think we should nonetheless explore the possibility of having him transferred to Maine for the purpose of standing trial?"

In January, 1974, an Assistant Attorney General wrote a physician in New Hampshire who had been treating the Defendant, inquiring into the doctor's opinion as to whether the Defendant was competent to stand trial.

On March 11, 1974, the Defendant addressed a *pro se* "Motion to Dismiss Indictments, Informations or Complaints" to the "Maine Supreme Court (sic)." For reasons not disclosed by the record, that motion and the accompanying papers were not filed in Superior Court in Kennebec County until September 9, 1974. Although the Defendant's affidavit of service stated that he had mailed a copy of the motion to the Attorney General, the Attorney General's file did not indicate receipt of the motion. The next entry in that file appears to have been a memorandum between Assistant Attorneys General dated August 8, 1974, indicating that Defendant's New Hampshire attorney had called to discuss the case.

On September 12, 1974, Defendant's attorney wrote the Attorney General requesting a delay on the motion to dismiss "pending your review of psychiatric reports which will be furnished by us." On December 6, 1974, a "Motion for Order to Examine Defendant to Determine Mental Condition" was filed and served by the Defendant. In his cover letter to the Attorney General, Defendant's attorney stated that it would take approximately six months to resolve certain matters in New Hampshire, but

---

**2.** The Defendant also allegedly confessed to the murder of one Harry Staples in North Berwick sometime in the early summer of 1965.

**3.** Although 5 M.R.S.A. § 199 appears to indicate that some responsibility for murder prose-

cutions lies with the District Attorney (then County Attorney), it is clear that the ultimate responsibility is upon the Attorney General. See 5 M.R.S.A. § 200–A (1973 Supp.).

that "(t)he fact that we are filing this Motion for Examination should not be construed in any way as a waiver of the constitutional rights asserted" in the earlier motion to dismiss.

Between April 18, 1975 and August 24, 1975, the record indicates that no other proceedings in the case were held pending appointment of co-counsel in Maine. On October 21, 1975, a motion for a speedy trial was filed.[4] On December 2, 1975, a letter from an Assistant Attorney General was filed indicating that proceedings "are being initiated" to transfer the Defendant to Maine. However, the actual transfer pursuant to executive agreement did not occur until sometime in March, 1976; at the hearing below, the Assistant Attorney General ascribed the delay to a "difficulty determining which procedure would be appropriate, insofar as he was in the mental hospital there." Although the hearing on the motion was originally scheduled for April 1, 1976, the defense requested a continuance, and the hearing on Defendant's motion to dismiss was finally held on April 26–27, 1976.

At the conclusion of the hearing below, the parties indicated their interest in having the case reported to the Law Court, and defense counsel indicated that he wished to research the matter before agreeing. On June 17, 1976, the Defendant and the State jointly filed a Motion for Interlocutory Report to the Law Court; the presiding justice entered an order reporting the case the same day.

In addition to the *pro se* Motion to Dismiss of March, 1974, and the Motion for Speedy Trial of October, 1975, the Defendant, through his counsel, filed Motions to Dismiss on speedy trial grounds in Febru-

ary, 1976 and April, 1977. The latter motion was allegedly occasioned by difficulties in preparing the record for transmission to this Court.[5]

The right to a speedy trial is guaranteed to all criminal defendants by the Constitutions of both the United States and the State of Maine. U. S. Const. amend. VI; Me.Const. Art. I, § 6. If there has been a denial of that right, dismissal of the charges is the only possible remedy. *Strunk v. United States*, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973).

In determining whether a defendant has been denied a speedy trial, we must "engage in a difficult and sensitive balancing process" of the four factors enunciated in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), as the criteria by which the asserted deprivation of a speedy trial is to be judged. Necessarily, such a balancing process involves a case by case approach. *State v. Carlson*, Me., 308 A.2d 294, 298 (1973).

### A. Length of Delay

The total period of delay runs from February 3, 1966, the date the indictment was returned, through April 27, 1976, the date of the hearing on the motion, Under *Barker*, the length of the delay is to some extent a triggering mechanism. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker v. Wingo*, supra, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.

Some jurisdictions calculate the length of delay by subtracting from the total period those periods which are attributable to the

---

4. Although both the docket and Attorney General's brief state that a Motion for a Speedy Trial and a Motion to Dismiss were filed on that date, the Motion in the record for that date is entitled "Motion for Speedy Trial" and it requests dismissal only "if the State fails to proceed to trial in this matter during the current term of Court."

5. In his letter signifying agreement to have this case reported to the Law Court, counsel for Defendant stated that by agreeing, the Defend-

ant was waiving no rights concerning his request for a speedy trial. In the balancing process which we conduct *infra*, we have accepted that reservation of rights insofar as it pertains to events occurring prior to April 27, 1976. However, we do not consider the time between April 27, 1976 and the date of this remand as part of the delay. The Defendant is charged with having consented to the delays inherent in appellate litigation.

Defendant, or during which the State is unable to proceed because the Defendant is being held for trial in another jurisdiction. See *Prince v. Alabama*, 507 F.2d 693 (5th Cir.), *cert. den.*, 423 U.S. 876, 96 S.Ct. 147, 46 L.Ed.2d 108, *reh. den.*, 423 U.S. 940, 96 S.Ct. 301, 46 L.Ed.2d 273 (1975). However, the State concedes, as it must, that at least for purposes of the triggering function, it would not matter if we were to adopt that rule and subtract the periods that the Defendant was awaiting trial in New Hampshire and Ohio, and the periods of delay occasioned by Defendant's requests for continuances. The remaining delay of approximately eight and one-half years is still "presumptively prejudicial" within *Barker* and requires us to examine and include the remaining three factors in the balance. We have moved from the "triggering" stage to the "balancing" stage upon far shorter delays than are present here. See *State v. Lewis*, Me., 373 A.2d 603, 608–609 (1977).

### B. Reason for Delay

In its brief the State acknowledges, "That portion of the period between the return of the indictment and the dating of the Defendant's 1974 motion to dismiss which was not attributable to the fact that the Defendant was awaiting trial in another jurisdiction was due . . . solely to the negligence of the State." Thus, at the outset, the State concedes that over seven years of the delay was due to the State's negligence. Negligence is to be weighed less heavily than deliberate attempts by the prosecution to delay the trial, but it must nevertheless be considered because the ultimate responsibility for such circumstances rests with the State and not the Defendant. *Barker v. Wingo, supra*, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.

We do not weigh the eleven and one-half month period between the indictment and the New Hampshire adjudication against

the State. Rather than ground our evaluation on the State's assertion that it was "unable" to proceed, we think that, under the circumstances, it was not unreasonable for the State to await disposition of the New Hampshire murder charge, especially in view of the fact that there were serious questions not only about the Defendant's sanity but also his competency to stand trial.

However, we are inclined to weigh the six-month period in 1971–72 when the Defendant was facing charges in Ohio against the State. It is true that the Defendant could not have been brought to trial during that period, yet it is clear from the record that the State's period of neglect of this case had already commenced. The State should not avoid the consequences of that neglect by the fortuity that another jurisdiction proceeded with charges during that time.

Once the Defendant's speedy trial claim was affirmatively brought to the State's attention at least as early as the late summer of 1974, it took until April, 1976, to have the matter brought forward for hearing. We weigh this period slightly against the State. In terms of time passed, almost one-half of the period can be attributed directly to requests by the Defendant to delay proceedings. Moreover, the State may have been somewhat in the dark as to whether the Defendant's intention was to "plead" to the charge, to press the Motion to Dismiss, or to actually go to trial.[6]

Nevertheless, when such a clear and substantial speedy trial issue as was present in this case as far back as 1974 is pending, the prosecution must assume the additional burden of taking all reasonable steps to press for an early resolution of that issue. There is little indication that any delay between August, 1974 and April, 1976 which was not occasioned by the Defendant is directly attributable to anything the

---

**6.** It appears from the December 5, 1974 letter from Defendant's counsel to the Assistant Attorney General that the parties had at least

considered the possibility that the Maine court might accept a plea of not guilty by reason of

State did or did not do.[7] Delays that would be normal and expected in other circumstances must be viewed in a different light when tacked on to the end of a long and unexcused period of delay.

On balance therefore, the reason for the delay must be charged against the State, first, because of the more than seven years of unexcused neglect, and second, because the State was content to let a substantial speedy trial issue be resolved in the ordinary course.[8]

## C. Defendant's Assertion of His Rights

As was said by the Court in *Barker*, The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it more difficult for a defendant to prove that he was denied a speedy trial. 407 U.S. at 531–532, 92 S.Ct. at 2193, 33 L.Ed.2d at 117–118.

Nevertheless, it is also clear from *Barker* that the failure to assert that right does not constitute a waiver. 407 U.S. at 528, 92 S.Ct. at 2191, 33 L.Ed.2d at 115–116. The State argues that the Defendant's failure to demand a speedy trial for a period encompassing four-fifths of the total delay should be given evidentiary weight against him in our balancing process.[9]

In this case, however, we reject that argument and strike the balance the other way. One of the reasons the Supreme Court was concerned with the evidentiary importance of a defendant's assertion of his right appears to have been that, in many cases, delay works to a defendant's advantage because witnesses die or leave the jurisdiction and memories fade. A defendant cannot sit on his rights hoping for that eventuality and then claim a speedy trial violation when those eventualities do not materialize. Such, however, is not the case at bar. There is no suggestion that those tactics were ever employed by this Defendant.

A second reason we are unable to weigh the Defendant's failure to assert his rights against him is that, as to Maine charges, he was without counsel and without formal notice of the nature and extent of charges pending against him. A different question might be presented if the Defendant had been arraigned at an earlier date on the Maine charges, and had been provided counsel. The fact that the Defendant had counsel in other states and on other charges does not change our conclusion, nor does the State's assertion that, by reason of his confession, the Defendant must have known of the charges pending against him. *Barker* suggests that a court should "attach a different weight to a situation in which a defendant knowingly fails to object from a situation in which his attorney acquiesces in a long delay without adequately informing his client, *or from a situation in which no counsel is appointed.*" 407 U.S. at 529, 92 S.Ct. at 2191, 33 L.Ed.2d at 116 (emphasis supplied). We make that distinction here.

## D. Prejudice to the Defendant

It is this last of the four *Barker* criteria that is most disputed by the parties. Potential prejudice must be evaluated in light of the three interests the speedy trial right

insanity without a full trial, as the New Hampshire and Ohio courts had apparently done.

7. Despite the State's assertion of its difficulty, we are at a loss to understand why it took three and one-half months to transfer the Defendant from New Hampshire to Maine when he not only had no objection to the transfer, but in fact was apparently anxious for it to occur.

8. The State argues in its brief that it took "reasonably swift" action to bring the Defend-

ant to trial after August 8, 1974. What may be reasonably swift action in a normal case is inordinate delay when a substantial speedy trial issue is pending. Moreover, the Defendant was asserting his speedy trial rights during this period.

9. The State concedes that the Defendant's failure to address his *pro se* motion to dismiss to the proper Maine court does not vitiate its effectiveness as an assertion of the right.

was designed to protect: (1) to prevent oppressive pre-trial incarceration; (2) to minimize anxiety and concerns of the accused; and (3) to limit the possibility that the defense will be impaired. 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118.

We must undertake to determine the prejudice to the Defendant despite the fact neither its presence nor its absence is controlling. See *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973).

The Defendant suggests that the first protected interest, prevention of oppressive pre-trial incarceration, is a factor here.[10] As to the second protected interest, the minimization of anxiety and concern, the Defendant suggests that the pendency of these charges has damaged his chances for work release and caused him psychological depression. Nothing to support that allegation appears in the record. "We need not decide whether, in a proper case, cognizable prejudice may result where defendant's rehabilitation was impaired by the existence of a detainer as defendant in this case made no showing to support this assertion." *State v. Gray*, 26 Or.App. 901, 554 P.2d 638, 641 (1976).

The final interest is the possible prejudice to the defense. The Defendant asserts that a number of important witnesses and potential suspects are now dead or unavailable for trial, and that some of the physical evidence is missing. The State responds that the missing witnesses would merely corroborate the testimony of those available to testify, and that the missing evidence would not be relevant to Defendant's guilt or innocence. On this record, it is difficult to determine the weight to be given to those assertions, although we cannot say there is no possibility of prejudice.

If the Defendant were to stand trial, his confession would undoubtedly be a crucial part of the State's case. While we intimate no opinion on the sufficiency of any independent evidence that the State could intro-

duce, it is clear that there is some corroborative evidence. Cf. *State v. Davis*, Me., 374 A.2d 322 (1977). The State, apparently believing that there was a serious question about the voluntariness of that confession, moved for a hearing on that issue. The State must prove the voluntariness of such a confession beyond a reasonable doubt. *State v. Collins*, Me., 297 A.2d 620, 627 (1972). Nevertheless, we think it would be difficult for the Defendant to "generate" much evidence casting doubt on the voluntariness of his confession some twelve years after it occurred. The State allegedly has a tape recording of that confession in its possession. Although we do not go so far as to say that prejudice has been shown, neither can we say that there is no possibility of prejudice. Compare *United States v. Cabral*, 475 F.2d 715 (1st Cir. 1973) (under the circumstances, where first three factors favored the Defendant but there was no prejudice, it was not so egregious a speedy trial violation as to warrant dismissal).

### Conclusion

We do not here undertake to lay down any general rule. The balancing process necessarily requires an *ad hoc* approach. In this particular case, the length of the delay and the reasons to justify the delay must be weighed heavily against the State. The Defendant's failure to assert his right during a time he was incarcerated and without counsel will not be weighed against him; he did not acquiesce in the delay in hopes of gaining an advantage, and he did not at any time waive his right to a speedy trial. Ultimately, he did effectively assert that right. Finally, we are persuaded that, at the least, there has been in this case a showing of potential prejudice to the defense.

The entry will be:

Remanded to the Superior Court with direction to grant the Defendant's motion to dismiss the indictment.

---

**10.** See *Smith v. Hooey*, 393 U.S. 374, 378, 89 S.Ct. 575, 577, 21 L.Ed.2d 607, 611 (1969) where the Court, in similar circumstances noted that prejudice might result from inability to obtain a concurrent sentence, and from the possibility of an increase in the duration of present imprisonment or a worsening of conditions under which the sentence must be served.

WERNICK, J., did not sit.

DELAHANTY, J., sat at oral argument and conference, but did not otherwise participate.