STATE of Maine

v.

**John J. JOUBERT, IV.**

Supreme Judicial Court of Maine.

Argued Jan. 10, 1992.

Decided Feb. 21, 1992.

<... >

Michael E. Carpenter, Atty. Gen., Wayne S. Moss (orally), Asst. Atty. Gen., Augusta, for State.

Jens–Peter W. Bergen (orally), Hodsdon & Associates, Kennebunk, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD and COLLINS, JJ.

McKUSICK, Chief Justice.

Defendant John J. Joubert, IV, appeals his conviction for murder entered in the Superior Court (Lincoln County, *Bradford, J.*) after a jury trial. We affirm.

During the evening of August 22, 1982, 11–year–old Ricky Stetson was murdered while jogging around Back Cove in Port-

land. He was killed by a combination of a stab wound to the chest and strangulation. In addition, he suffered a distinctive wound of a human bite mark on the back of his right leg, on top of which were a stab wound and crisscross slashes, an apparent attempt to cover up the bite mark. The next morning, August 23, Ricky Stetson's body was discovered by a passerby on the grass near Tukey's Bridge.

As a result of information supplied by several people who had been in the Back Cove area at the time of the murder, the police investigation eventually came to focus on defendant Joubert. Nineteen years old at the time of the murder, he grew up in Portland, graduated from a local high school, and worked at various jobs. In December of 1982, just over three months after the Stetson murder, Joubert left Portland to join the Air Force and later was stationed in Nebraska. In 1984, Airman Joubert was arrested in Nebraska and charged with the separate murders of two young Nebraska boys, both of whom had been stabbed to death. He pleaded guilty to both crimes and on October 9, 1984, was sentenced to death on both charges. An automatic appeal to the Nebraska Supreme Court ensued.

On January 8, 1986, a Cumberland County grand jury indicted Joubert for Ricky Stetson's murder. In January 1990, Joubert, then still sitting on death row in Nebraska while pursuing post-conviction relief, was transferred to Maine for trial on the Stetson indictment. The Superior Court moved the venue of Joubert's trial to Lincoln County, where jury selection began on October 2, 1990. After nine days of trial the jury on October 15 found Joubert guilty, and the court sentenced him to life imprisonment. Joubert filed a timely appeal.[1]

## I.

### Alleged Speedy Trial Violation

Joubert first contends that the 57-month delay between January 8, 1986, when he was indicted for the Stetson murder, and October 2, 1990, when his trial began, violated his constitutional right to a speedy trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 6, of the Maine Constitution. We do not agree.

The analysis of a speedy trial claim is identical under both the Federal and the State Constitutions. *See State v. Beauchene,* 541 A.2d 914, 918 (Me.1988). That fact specific analysis, set forth by the U.S. Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), requires us to apply a "delicate balancing test that takes into account all of the circumstances of the case at hand." *State v. Murphy,* 496 A.2d 623, 627 (Me. 1985). While there is no exhaustive list of factors to be considered, the Supreme Court identified four: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192. The first *Barker* factor can be dispositive in that if the delay between indictment and trial in the particular case is not sufficiently long to raise an inference of prejudice to defendant, "there is no necessity for inquiry into the other factors that go into the balance." *Id.; see also Beauchene,* 541 A.2d at 918. In the circumstances of the case at bar, where Joubert while imprisoned in Nebraska was indicted in Maine for a murder that had occurred 3½ years before, a delay of nearly five years in bringing Joubert to trial is plainly long enough to raise an inference of prejudice and thereby to necessitate further analysis using the other three *Barker* factors. Mindful of the fact that "these factors have no talismanic qualities," *Barker,* 407 U.S. at 533, 92 S.Ct. at 2193; *see also Beauchene,* 541 A.2d at 915, but rather are part of a sensitive and delicate *ad hoc* balancing, we conclude from a full

---

1. While Joubert's present appeal from his conviction was pending, he filed a habeas corpus petition in the Superior Court seeking to prevent his being promptly returned by Maine to Nebraska as required by a prior agreement between the Governors of those States. We affirmed the Superior Court's denial of his petition. *See Joubert v. McKernan,* 588 A.2d 748 (Me.1991).

*Barker* analysis that Joubert's right to a speedy trial was not violated.

■ Following his 1984 convictions in Nebraska on his guilty pleas to the two Nebraska murders, Joubert challenged his two death sentences by a succession of direct appeals and of petitions for post-conviction relief. The Nebraska Supreme Court affirmed his convictions on December 29, 1986, and the denial of his petitions for post-conviction relief on May 5, 1990. During this time, starting in January 1986 when Joubert was indicted in Maine and concluding four years later, the Attorneys General of Maine and Nebraska tried in good faith to work out an agreement between the Governors of those states by which Nebraska would transfer Joubert to Maine to stand trial and Maine would after trial return him promptly to Nebraska for the carrying out of his Nebraska death sentences. In those negotiations Nebraska officials expressed reluctance to release Joubert from their custody because of concern that he might not be promptly returned to Nebraska after his Maine trial.

It was not until September 1989 that Joubert, while still in Nebraska awaiting the Nebraska Supreme Court's decision on his petitions for post-conviction relief, first asked to be transferred to Maine, and on November 7, 1989, he filed a motion for a speedy trial in the Maine Superior Court and formally requested the disposition of the Maine charges against him. Finally, in January 1990 the two States worked out an executive agreement and Joubert was transferred to Maine later that month.

The second *Barker* factor, the reasons for the delay in bringing Joubert to trial, provides no basis for finding a speedy trial violation here. During the time between the indictment and Joubert's request to be returned to Maine for trial, he was incarcerated in Nebraska for the two murders he had pleaded guilty to having committed in that state. From the time Joubert's Maine indictment was returned until late 1989, the Maine Attorney General's Office actively pursued an agreement with the State of Nebraska in order to have Joubert transferred here. During that time Ne-

braska authorities informed Maine authorities that Joubert intended to fight extradition. Thus, the delay until at least his September 1989 request to be returned to Maine weighs heavily against Joubert. *See Beauchene,* 541 A.2d at 919 (fighting extradition and time spent handling defendant's motions attributable to defendant). Even after Joubert's September 1989 request for trial in Maine, he could not be returned until the State of Nebraska was willing to release him, and that agreement did not come until January 1990. A later 5–month delay in the trial originally scheduled for July 1990 resulted from a continuance granted on Joubert's own motion. That delay is also attributable to him. *See id.* Thus, at most the 10 months between Joubert's first request to return to Maine (September 1989) and the originally scheduled trial date (July 1990) can be charged in any way to the State. Even in that period, trial was delayed by a succession of pretrial motions filed by Joubert.

In our analysis of the reasons for the 57–month delay, it is also significant that in this record we can find no sign of "any bad faith or improper motive on the State's part" to delay Joubert's trial. *State v. Goodall,* 407 A.2d 268, 281 (Me.1979). Defendant's argument that the State is responsible for the delay because it did not inform him of the charge and so did not afford him an opportunity to apply pressure to be returned to Maine to face a speedy trial, misapprehends the process involved. The State of Maine did not have it within its power to bring Joubert back to Maine. His return depended entirely on whether, and when, the State of Nebraska decided to release Joubert to the Maine authorities.

Consideration of the other two *Barker* factors confirms that the Superior Court correctly denied Joubert's speedy trial motion. The third *Barker* factor, defendant's assertion of his right to a speedy trial, does not help Joubert. He made no request to come back for trial in Maine until September 1989, 44 months after his indictment. Although that fact does not count heavily against Joubert because until May 1989 he

did not have Maine counsel and was not given formal notice of the nature and extent of the Maine charge until still later, *see State v. Steeves*, 383 A.2d 1379, 1383 (Me.1978), Joubert at the same time draws no benefit from the third *Barker* factor. Finally, on the fourth *Barker* factor of prejudice, Joubert makes only a speculative contention that the 57–month delay may have prejudiced him by resulting in the unavailability of defense witnesses who could have testified for him had the trial been held soon after the 1986 indictment. Joubert, however, comes forward with no specification of any witness who would have provided him an alibi or have contradicted the State's case against him. In light of the overwhelming evidence linking Joubert to the Stetson murder and the entirely speculative nature of the alleged lost testimony, the degree of prejudice from the delay, if any existed, weighs little in Joubert's favor in the *Barker* analysis.

In sum, on a full analysis of the circumstances of this case under the four *Barker* factors, Joubert falls far short of showing any violation of his constitutional right to a speedy trial.

## II.

### *Nebraska Journalist's Interview of Joubert*

During Joubert's Maine trial, the court admitted the testimony of Nebraska journalist Mark Pettit who, in the course of gathering material for a book, had interviewed Joubert several times in prison in Nebraska. By Pettit's testimony, Joubert, in response to a question whether he had killed Ricky Stetson, said, "I can't lie to you. I can't say I didn't do it." Joubert now argues that his statement should have been excluded because Pettit acted as an agent for the State and thus admission of his statements in the interviews violated his Fifth and Sixth Amendment rights. We do not agree.

■ The protections of those Amendments do not extend to a defendant's incriminating statement made to a private individual unless that individual is acting on behalf of the government or the statement results from police subterfuge or intimidation. *See, e.g., Arizona v. Mauro*, 481 U.S. 520, 526–30, 107 S.Ct. 1931, 1934–37, 95 L.Ed.2d 458 (1987); *Maine v. Moulton*, 474 U.S. 159, 177 n. 14, 106 S.Ct. 477, 488 n. 14, 88 L.Ed.2d 481 (1985). Contrary to Joubert's contention, Pettit was not motivated by an interest in advancing the police investigation; he did not exchange information with the police and did not provide them with any statements by Joubert. Pettit had no working relationship with the police, nor did the police ask him to discuss certain topics with or ask certain questions of Joubert. Rather, his purpose was entirely self-directed toward his goal of writing a book. Joubert, although he knew of Pettit's plan for a book, did not impose any restrictions on Pettit's use of his interview statements. Rather, he signed a release giving Pettit permission to talk with him and to use information from the interviews for any "legitimate purpose."

Joubert's reliance on *Tarnef v. State*, 512 P.2d 923 (Alaska 1973), is misplaced. In that case the putative agent worked closely with the police and had promised to turn over to them any statements he obtained from the prisoner. In contrast, Pettit was not working to further the case of the police against Joubert; he owed no obligation to the police. A private investigation into a crime, although facilitated by the police by giving the investigator access to a defendant held in custody or access to police files on the case, does not, without more, become state action. Pettit's prison interview of Joubert did not violate his Fifth or Sixth Amendment rights.

## III.

### *Evidence of Similar Bite Marks on Another Joubert Victim*

■ Danny Joe Eberle was one of the Nebraska boys whom Joubert pleaded guilty to murdering in 1984. In Maine, over Joubert's objection, Pettit, the Nebraska journalist, testified that Joubert told him that during an encounter with Eberle, he had bitten Eberle in several places and

that over the bite mark on Eberle's left thigh he had "used a knife to try to hide the mark by cutting it or carving it." At trial the State carefully avoided eliciting any testimony showing that Eberle had been killed or that Joubert had been convicted in Nebraska for his murder. The trial court admitted the evidence on the ground that it was "signature" evidence tending to identify Joubert as Ricky Stetson's killer. Joubert contends that the admission of this evidence was error. We do not agree.

The evidence of the Eberle bite wound is evidence of a prior bad act. M.R.Evid. 404(b) bars the admission of evidence of a prior bad act for one specific purpose; namely, to prove the character of a person in order to show that he acted in conformity therewith. Rule 404(b) in no way, however, prohibits the use of such evidence for other purposes, including proving the identity of a perpetrator, provided of course that the proffered evidence is relevant under M.R.Evid. 402 and provided that it is not excluded under M.R.Evid. 403 on the ground its probative value is substantially outweighed by the danger of unfair prejudice caused the defendant. *See State v. Leone*, 581 A.2d 394, 400 (Me.1990) (citing advisor's note to M.R.Evid. 404(b) for proposition that prior bad acts are admissible when offered for another purpose, such as proof of motive or intent). *See also* Field & Murray, *Maine Evidence* § 404.3, at 109 (1987).

We review only for clear abuse of discretion the trial court's determination that the Eberle bite wound evidence is admissible under Rules 402 and 403. *See State v. Whitmore*, 591 A.2d 244, 245 (Me.1991) (clear abuse-of-discretion standard used to review M.R.Evid. 403 ruling); *State v. Wallace*, 431 A.2d 613, 616 (Me.1981) (trial court has broad discretion in ruling on admissibility of relevant evidence challenged as unfairly prejudicial under M.R.Evid. 403).

The trial court made its determination of the admissibility of the Eberle wound evidence in the course of ruling on Joubert's motion *in limine* that all evidence concerning Joubert's murder of Eberle be excluded. The court had before it a stipulation by the parties detailing the similarity of the Maine and Nebraska crimes. That stipulation amply supports the trial court's initial determination that the circumstances of the Eberle murder, particularly Eberle's bite wounds, are relevant to proving the identity of the Stetson killer. Ricky Stetson and Danny Joe Eberle were both white males of about the same age and height. Both boys were killed by knife stabs and both were bitten on the leg and had crisscross slash wounds that attempted to disguise the bite marks. Before being attacked, both victims were on foot and had been stalked by their assailant. While neither was sexually assaulted, both had been bound, and the bodies of both had been left at the murder sites. The court was properly persuaded that the particularly distinctive bite wounds of both Eberle and Stetson made the Eberle wound evidence relevant. The Eberle bite wound was relevant evidence as defined by M.R.Evid. 401 because it tends to make it more probable that Joubert was the person who killed Ricky Stetson. The unusual bite marks with concomitant slashes, together with the similar physical characteristics and manner of death of both victims, "are sufficiently idiosyncratic" to support the reasonableness of the trial court's inference that they were killed by the same person. *See United States v. Pisari*, 636 F.2d 855, 859 (1st Cir.1981).

Even though relevant as identity evidence, the Eberle bite wound evidence must nonetheless be excluded pursuant to M.R.Evid. 403 "if its probative value is substantially outweighed by the danger of unfair prejudice." *See Wallace*, 431 A.2d at 616. The mere harmfulness of the evidence to the defendant's case is not what is meant by unfair prejudice. *See State v. Heald*, 393 A.2d 537, 542 (Me.1978). Here the trial court did not abuse its discretion in concluding that the Eberle bite wound evidence, introduced without any reference to Eberle's death and Joubert's conviction, was not so unfairly prejudicial as to outweigh substantially its probative value in establishing the identity of Ricky Stetson's killer. Evidence of the Eberle bite wound,

in isolation, had a high probative value bearing directly on the issue of the Stetson killer's identity. Following the court's dictate, the State limited its presentation to only the evidence of Eberle's bite mark and slash wounds and Joubert's responsibility for them. Moreover, the court gave the jury a limiting instruction explaining that it could consider the Eberle bite wound evidence only on the identity issue. Given the narrow scope of Pettit's testimony and the jury instruction, the trial court did not abuse its discretion in determining that any unfair prejudice that Joubert might suffer did not substantially outweigh the high probative value of that evidence.

### IV.

### *Sketch Drawn from Hypnotically Refreshed Description*

█ Joubert next contends that the trial court erred in admitting a police sketch that was drawn on the basis of a witness's hypnotically refreshed description of a bicyclist seen following Ricky Stetson on the evening of his murder. We do not agree.

The law on the global issue of the admissibility of hypnotically refreshed testimony is in a state of flux.[2] We, however, need not address the global issue. Even assuming for purposes of analysis that hypnosis "is dangerously able to plant a fixed and perhaps erroneous image in the person's mind," *see State v. Commeau*, 438 A.2d 454, 458 (Me.1981), the particular concerns about the reliability of post-hypnotic testimony are not presented in the case at bar.

On the evening that Ricky Stetson was murdered, Philip Vezina, who knew Stetson as a former neighbor, saw him jogging along Back Cove with an unknown bicyclist following him. A few weeks later and before Joubert had become a suspect in the investigation, Vezina agreed to be hypnotized at the request of the police. At the time of the hypnosis neither Vezina nor Dr. Burnham, the medical doctor doing the hypnosis, nor the police conducting the Stetson murder investigation knew Joubert or had any reason to suspect Joubert's involvement in the crime. Before the hypnosis session, neither the police nor anyone else showed Vezina a photograph or sketch of anyone, let alone Joubert. Dr. Burnham was a private practitioner in Gorham and not a police department employee, and he knew no more about the case than that a young boy had been killed while jogging in the vicinity of Back Cove and that witnesses had seen another person in the area at about the time of the murder.

The only evidence at trial that involved Vezina's hypnosis in any way was the police sketch of the unknown bicyclist he had seen following Ricky Stetson on the evening of the murder. At trial Vezina testified to the events of that evening just as he had told the police prior to the hypnosis session; and he could not identify Joubert either from photographs in the media or in person in the courtroom. The narrow issue presented here in whether the trial court erred by admitting the police sketch solely because it was drawn from Vezina's hyp-

---

**2.** The Supreme Court's most recent pronouncement on the issue in *Rock v. Arkansas*, 483 U.S. 44, 59–60, 107 S.Ct. 2704, 2713–14, 97 L.Ed.2d 37 (1987) (*per se* exclusion of defendant's own hypnotically refreshed testimony violated the due process right to conduct one's own defense), identifies three generally accepted shortcomings of hypnotically refreshed testimony:

> [T]he subject becomes "suggestible" and may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to "confabulate," that is, to fill in details from the imagination, in order to make an answer more coherent and complete; and, the subject experiences "memory hardening," which gives him great confidence in both true and false memories, making effective cross-examination more difficult.

Other courts have recognized three additional problems associated with hypnosis: i) pseudo-memory, ii) source amnesia, and iii) loss of critical judgment. *See, e.g., State v. Adams*, 418 N.W.2d 618, 623 n. 5 (S.D.1988). Other jurisdictions have developed at least four different approaches: i) *per se* admissibility, the fact of hypnosis going to weight and credibility, *see, e.g., State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984), ii) *per se* inadmissibility, *see, e.g., People v. Zayas*, 131 Ill.2d 284, 137 Ill.Dec. 568, 546 N.E.2d 513 (1989), iii) adherence to procedural guidelines, *see, e.g., State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981) (seminal case), or iv) the totality of the circumstances, *see, e.g., People v. Romero*, 745 P.2d 1003 (Colo.1987), *cert. denied*, 485 U.S. 990, 108 S.Ct. 1296, 99 L.Ed.2d 506 (1988).

notically enhanced memory of the appearance of the unknown bicyclist.

In *Commeau* we pointed out that even assuming the unreliability of hypnotically refreshed testimony, "there could [on the *Commeau* facts] have been no suggestion as to the defendant since he was not considered a suspect until a day after the hypnosis procedure." *Id.* The reasoning of *Commeau* is controlling in the case at bar. As was the situation in that case, even if the police or Dr. Burnham had wanted to suggest Joubert to the hypnotized witness, they could not have done so since they themselves did not know for whom they were looking. *See, e.g., Zani v. State,* 767 S.W.2d 825, 836 (Tex.Ct.App. 1989), *on remand from* 758 S.W.2d 233 (Tex.Cr.App.1988) (applying a totality-of-the-circumstances test: "To the extent the hypnotist lacks information, he is not in a position to bias, unduly influence, or contaminate the hypnotized person's recollections"); *Daniels v. State,* 528 N.E.2d 775, 778 (Ind.1988), *vacated on other grounds,* 491 U.S. 902, 109 S.Ct. 3182, 105 L.Ed.2d 691 (1989) (acknowledging a rule of *per se* inadmissibility, but allowing the admission of hypnotically refreshed testimony in a case where the police had no suspects at the time of the hypnosis and were unaware of the defendant's involvement). In these circumstances then, the admission of Vezina's hypnotically refreshed testimony and the resulting sketch was not error.

## V.

### *Joubert's Challenge to the New Sentence Review by the Law Court*

Acting pursuant to a 1989 statute providing for sentence appeals to the Law Court, Joubert filed a petition for appellate review of his life sentence. After a preliminary review of his petition, the three-justice Sentence Review Panel denied the appeal on the ground that it did not have enough merit to justify a review by the full Law Court. Joubert now contends that the 1989 statute changed the law of appellate sentence review in a way to violate the *ex post facto* clauses of both the United States and Maine Constitutions, U.S. Const. art. I,

§ 10; Me. Const. art. I, § 11. We do not agree.

In 1982, when Ricky Stetson was murdered, a defendant sentenced to imprisonment for one year or more could appeal the sentence only to the Appellate Division of the Supreme Judicial Court, a panel consisting of three justices of the court. *See* 15 M.R.S.A. §§ 2141, 2142 (1980). In 1989 the legislature repealed sentence review by the Appellate Division and substituted appeals to the full Law Court, subject to the discretionary allowance of a petition for appellate review by a three-justice Sentence Review Panel. *See* P.L.1989, ch. 218, §§ 1–2, 5 (effective September 30, 1989), codified at 15 M.R.S.A. §§ 2151–2157 (Supp.1991).

As an initial proposition, it is immediately apparent that the 1989 statute does not present any *ex post facto* problem; the post–1989 sentence appeals process on its face is no "more onerous than [that provided by] the prior law." *Miller v. Florida,* 482 U.S. 423, 431, 107 S.Ct. 2446, 2452, 96 L.Ed.2d 351 (1987). Under both the earlier statute and the present one, a defendant's sentence is reviewed by a panel of three justices of the Supreme Judicial Court. The present statute adds an additional level of sentence review by the full Law Court if any one of the three justices finds enough merit in the appeal to grant the defendant's petition. The present review of petitions for appellate review of sentences by the first three justices, even if it ends in denial, involves the same review as was accorded such appeals by the former three-justice Appellate Division. It is obvious that a sentence appeal such as Joubert's that lacks enough merit to get a full substantive review under the post–1989 statute would have been denied also by the Appellate Division under the prior statute. The 1989 sentence appeal statute in no way increases the burdens upon a defendant and in no way decreases his opportunity for appellate review of his sentence.

A full *ex post facto* analysis brings us to the same conclusion. The United States Supreme Court has recently reaffirmed its holding in *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 68–69, 70

L.Ed. 216 (1925), restricting the circumstances in which a change in a criminal statute will violate the constitutional prohibition of *ex post facto* legislation. *See Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). By the *Collins* analysis, an *ex post facto* violation exists only i) if the new statute punishes as a crime an act that was innocent when done, or ii) if it makes more burdensome the punishment for a crime after its commission, or iii) if it deprives one charged with crime of a defense available according to law at the time the act was committed. *See id.,* at ———, 110 S.Ct. at 2719, 111 L.Ed.2d at 39. The 1989 sentence review statute made none of these unconstitutional changes in the law applicable to the case at bar.

### VI.

#### *Conclusion*

On his appeal Joubert makes several other contentions, but after full examination we find none of them merits discussion. Joubert fails to demonstrate any reversible error in his conviction for the 1982 murder of Ricky Stetson.

The entry is:

Judgment affirmed.

All concurring.