STATE of Maine

v.

Patricia HARPER.

Supreme Judicial Court of Maine.

Argued June 18, 1992.

Decided July 31, 1992.

Michael Carpenter, Atty. Gen., Charles K. Leadbetter, Jeffrey L. Hjelm, Donald W.

Macomber (orally), Asst. Attys. Gen., Augusta, for the state.

Catherine R. Connors (orally), Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, COLLINS, and RUDMAN, JJ.

RUDMAN, Justice.

Patricia Harper appeals her conviction for the 1985 murder of Richard Pinard entered in the Superior Court (Aroostook County, *Pierson, J.*) after a jury trial. We vacate defendant's conviction and remand the case for a new trial because the State's introduction at trial of an inculpatory statement made by defendant to a DHS worker so violated her Sixth Amendment right to counsel and the prophylactic rule of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that defendant was deprived of a fair trial. We disagree, however, with defendant's contention that the 20–month, 3–day delay between her arrest and the commencement of her trial violated her constitutional right to a speedy trial and thereby requires the dismissal of the charge against her. Our decision to remand for a new trial renders unnecessary our consideration of all other issues raised by defendant.

I.

*Alleged Speedy Trial Violation*

■ Defendant contends that the 20–month, 3–day delay between June 16, 1989, when she was arrested and incarcerated on the murder charge,[1] and February 19, 1991, when her trial began,[2] violated her constitutional right to a speedy trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 6, of the Maine Constitution. We do not agree.

■ The analysis of a speedy trial claim is identical under both the Federal and State constitutions, *see State v. Carisio,* 552 A.2d 23, 26 (Me.1988), and requires us to apply "a delicate balancing test that takes into account all of the circumstances at hand." *State v. Murphy,* 496 A.2d 623, 627 (Me.1985). That analysis was set forth by the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), wherein the Court suggested four non-exhaustive factors be considered: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."

Although the first *Barker* factor, length of delay, can be determinative if the delay is "not sufficiently long to raise an inference of prejudice to defendant," *State v. Joubert,* 603 A.2d 861, 863 (Me.1992), the present delay of over 20 months is long enough to trigger analysis under all the *Barker* factors. *See State v. Carisio,* 552 A.2d at 26 (16–month delay triggers presumption of prejudice); *State v. Willoughby,* 507 A.2d 1060, 1065 (Me.1986) (14–month delay presumptively prejudicial).

■ The second *Barker* factor, the reason for the delay, does not weigh heavily in either direction. Fifty-one days of the total six hundred and twelve-day delay is attributable directly to defendant's own actions and thus is not charged against the State. *See State v. Joubert,* 603 A.2d at 864;

---

1. Although the delay for purposes of a speedy trial analysis is normally measured from the date of the indictment to the first day of trial, *see State v. Joubert,* 603 A.2d 861, 863 (Me.1992); *State v. Cadman,* 476 A.2d 1148, 1151, n. 4 (Me.1984), when, as here, the arrest and incarceration of defendant precedes her formal indictment, the date of arrest begins the delay period. The State initially filed a complaint against defendant in the District Court (Houlton). The District Court (*Griffiths, J.*) arraigned defendant three days after her arrest and denied her bail. About one month later, the District Court dismissed the charges against her due to her indictment in the Superior Court. She continued to remain incarcerated without bail prior to her trial.

2. Defendant's first trial began on February 19, 1991, but was postponed due to defense counsel's illness. The defense then moved for a mistrial which was granted. Defendant's retrial began April 1, 1991. Because the mistrial is in no way attributable to the State, and the time lapse between trials was solely due to the mistrial, we calculate the time lapse for defendant's speedy trial rights as of her first trial date.

*State v. Lewis,* 373 A.2d 603, 609 (Me.1977). On August 10, 1989, defendant filed a motion for the services of a private investigator. That motion was decided on September 29, 1989—50 days later. One other defense motion, a motion for preparation of a transcript of the grand jury testimony, was filed on July 10, 1989, and decided the next day, a lapse of one day. There was no other time period during which a defense motion produced the delay. The delay was nonetheless not without reason. For over three and one half years the case was treated as a missing person case. Thus while the State ordinarily investigates the crime prior to an arrest, in the present case nearly all of the State's investigation took place after defendant's arrest. During that time the State combed through its missing persons file culling out over 1000 pages of discovery relevant to the case. Body identification had to be performed along with forensic tests on other evidence. Finally many witnesses had to be reinterviewed once the status of the case shifted from one of a missing person to a homicide. Despite defendant's arguments that the State violated its discovery duties, there appears to be no "bad faith or improper motive on the State's part" to delay defendant's trial. *State v. Goodall,* 407 A.2d 268, 281 (Me.1979). Thus at a minimum the second *Barker* factor does not weigh heavily against the State.

Next, because defendant first asserted her right to a speedy trial in her motion to dismiss dated February 1, 1991—over 19 months after her incarceration and 3 weeks prior to her trial, defendant gains nothing from the third *Barker* factor, defendant's assertion of her right to a speedy trial.

▉ Finally, there is no indication that defendant suffered prejudice from the delay between her arrest and her trial. As we explained in *State v. Beauchene,* 541 A.2d 914, 919 (Me.1988), prejudice is evaluated "in light of the three interests that the constitutional right to a speedy trial is designed to protect: 1) to prevent undue and oppressive incarceration prior to trial; 2) to minimize anxiety and concern to the accused accompanying public accusation; and

3) to limit the possibility the defense will be impaired." (Citations omitted). The most important of those interests is the last. *See Barker v. Wingo,* 407 U.S. at 532, 92 S.Ct. at 2193. Although defendant was incarcerated during the entire period of delay, the incarceration was in the circumstances not undue or oppressive. Nor does the lengthy incarceration appear to be due to any improper motive or bad faith on the part of the State. The only anxiety defendant professes to have suffered is separation from her children, especially from the child she was breastfeeding. That is simply not the type of anxiety caused by public accusation that is addressed by the second interest to be evaluated. There is no suggestion that the delay itself caused any evidence to be unavailable to defendant at trial. Indeed, the only detriment caused the defense by the delay was the further dimming of the witnesses' memories. However, given the 3.5 years prior to arrest, the extra 20 months to trial is not shown to be a substantial cause of dimmed memories. Moreover, defendant nowhere addresses how dimmed memories worked to her disadvantage—they could as easily have helped her defense, and prejudice does not follow when the delay works to the advantage of a defendant. *See State v. Goodall,* 407 A.2d at 281.

In sum, although the 20–month, 3–day delay was long enough to require consideration of all the *Barker* factors, there is no indication that the delay resulted from any bad faith or ill-will on the part of the State. Defendant did not assert her right to a speedy trial until three weeks before her trial and gives no indication that she was prejudiced by the delay. We conclude that defendant's right to a speedy trial was not violated.

## II.

### *Admissibility of Defendant's Statements to DHS agent Ann Levesque*

Defendant next contends, for the first time on appeal, that her statements to DHS agent Ann Levesque resulted from an interrogation that violated the rule of *Mi-*

*randa v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and her Sixth Amendment right to counsel. She argues that the admission of Levesque's testimony concerning her statements, albeit unobjected-to at trial, constitutes obvious error and hence requires a new trial. Levesque's interrogation of defendant was in blatant disregard of both of defendant's Fifth and Sixth Amendment right to counsel; thus, because the trial court had before it all the information necessary to draw that conclusion, and the admission of that confession in the circumstances of this case was prejudicial to defendant, we hold that it was obvious error to admit that testimony.

During defendant's trial the State called Ann Levesque as a witness. Levesque identified herself as "a child protective worker for the Department of Human Services" and explained that on June 19, 1989, three days after defendant was arrested, she "went to [defendant's] arraignment at the District Court ... [and] made arrangements with [a detective] to speak with [defendant] before she was taken back to the County Jail after her arraignment." At her arraignment, defendant had filed a motion for appointment of counsel. The District Court (Houlton, *Griffiths, J.*) at that time appointed counsel to represent defendant.

Levesque's testimony showed that she did converse with defendant for between 15 minutes to a half hour in a closed conference room at the District Court building. Although no one else was present in the room, a detective stood guard outside the door, which "didn't have a doorknob on it in the inside, so somebody had to be outside to let [them] out." Levesque testified about that conversation and its purpose as follows:

> I got the sense throughout the weekend that [defendant] wasn't taking the situation seriously. I was concerned about what was going to be happening with the kids. I just felt that there had to be something more going on; and I asked

her to level with somebody about what was happening, if there was more than what was being said ... about the murder ... to let somebody know.

> We were talking about the seriousness of this, what was going to happen to the children if she was convicted of murder. I told her that I felt that if she had more information, she needed to tell somebody

> ...

> I mentioned that we had [defendant's daughter's] statement and that was very damaging and I also told her I believed [her daughter] ... I told her that they had found a body in the wood shed.

Levesque testified on direct examination that during their conversation, after she had told defendant that "[her daughter's] statement was extremely serious and things did not look good, ... [defendant] swore that she didn't kill him, but she did say she helped to bury the body." Defense counsel raised no objection to Levesque's testimony but merely cross-examined her regarding the details of the conversation.

As stated by the Supreme Court: "The arraignment signals the initiation of adversary judicial proceedings and thus the attachment of the Sixth Amendment; thereafter, government efforts to elicit information from the accused, including interrogation, represent critical stages at which the Sixth Amendment applies." *Michigan v. Jackson,* 475 U.S. 625, 629–30, 106 S.Ct. 1404, 1407–08, 89 L.Ed.2d 631 (1986) (citations omitted). There is no question that Levesque's conversation with defendant, during which Levesque was eliciting incriminating responses from defendant, qualified as "government initiated" interrogation and was commenced after her Sixth Amendment rights had attached. *Id.* Moreover, by virtue of having requested appointed counsel at her arraignment, defendant also invoked the prophylactic rule [3] of *Michigan v. Jackson* that would have invalidated any waiver of her Sixth Amendment rights that defendant might have giv-

---

**3.** In *Michigan v. Harvey,* 494 U.S. 344, 349, 110 S.Ct. 1176, 1179, 108 L.Ed.2d 293 (1990), the Supreme Court referred to *Michigan v. Jackson* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), as laying down a "prophylactic rule" providing procedural safeguard that is not itself a right protected by Constitution.

en to Levesque. *See State v. Rose,* 604 A.2d 24, 27 (Me.1992) ("[d]efendant's Sixth Amendment right to effective representation at trial was significantly impaired because the State ignored his formal and unequivocal request for counsel after proceedings had been initiated ... *Michigan v. Jackson* requires that his subsequent waiver for the police-initiated interrogation be declared invalid").

In the context of the Fifth Amendment, the Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), held that the privilege against self-incrimination prohibits admitting statements made by a suspect during custodial interrogation without a prior warning. As the Court explained in *Minnesota v. Murphy,* 465 U.S. 420, 430, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984):

> To dissipate "the overbearing compulsion ... caused by isolation of a suspect in police custody" *United States v. Washington,* 431 U.S. 181, 187 n. 5 [97 S.Ct. 1814, 1819 n. 5, 52 L.Ed.2d 238] (1977), the *Miranda* Court required the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it.

There is no indication that Levesque provided defendant with *Miranda* warnings prior to their conversation. Although a failure to give *Miranda* warnings does not abridge a defendant's constitutional privilege against compulsory self-incrimination but departs only from the prophylactic standards laid down by the Supreme Court

in *Miranda* designed to safeguard that privilege, *see Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974), statements taken in violation of *Miranda*'s prophylactic rules may nonetheless not be "used to prove the prosecution's case at trial." *Id.* 417 U.S. at 445, 94 S.Ct. at 2364. Moreover, even if *Miranda* warnings were given defendant by Levesque, that defendant had previously invoked her right to counsel would raise a per se bar against government-initiated interrogation, and any waiver she might have made would be invalid. *See Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *State v. Rose,* 604 A.2d at 27–28.

 Although, it is inescapable that in the circumstances of this case, there was, in addition to a Sixth Amendment violation, either a *Miranda* or an *Edwards* violation, the unpreserved nature of those errors renders them reviewable only for obvious error. *See State v. True,* 438 A.2d 460, 467–69 (Me.1981). The *True* test of obvious error requires this court to look to both the obviousness of the error and the injustice actually worked on defendant to determine whether it "cannot in good conscience let the conviction stand." *Id.* at 469. Turning first to the "obviousness" prong, it is evident that the admission of Levesque's testimony constituted error of the most clear-cut variety. The only factor that would have made her interrogation of defendant more plainly in violation of the Sixth Amendment and *Miranda* would be if she had been a uniformed law enforcement officer. In any event she is clearly a government agent.[4] That fact along with all of the other necessary facts for the court

4. Although *Miranda* did define interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody," *Miranda v. Arizona,* 384 U.S. at 444, 86 S.Ct. at 1612, the Supreme Court has indicated that *Miranda* is not limited to criminal law enforcers. *See Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) (interrogation occurred while defendant in jail on unrelated matter and questioning was performed by IRS agent who was a "civil investigator" required to report to intelligence division any indication of fraud or criminal potential); *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359

(1981) (*Miranda* held applicable to court-ordered psychiatric examination; that psychiatrist not a police officer, government informant, or prosecuting attorney was "immaterial"). In the present case, the State conceded at oral argument that Ms. Levesque was a government agent to whom the rules of *Miranda* apply. *Accord Cates v. State,* 776 S.W.2d 170, 173 (Tex.Crim. App.1989) (*Miranda* applicable to questioning of defendant in jail by investigator for Dep't of Human Resources for although "she did not have the power to arrest, she was acting as an agent of law enforcement," due to her "responsibility to discover child abuse and report it").

itself to see the error being committed were squarely before the court Levesque told the court that at the time of her interview, defendant had already been arraigned. The court would surely know that her counsel had been appointed at that time and could infer by Levesque's attendance at the arraignment, that she was even aware of defendant's request for appointed counsel. Levesque's testimony showed that the conversation was held at her initiative and that she was saying things to defendant that were clearly likely to elicit an incriminating response. That the admission of Levesque's testimony violated defendant's Sixth Amendment rights and the rules set down in *Miranda* was indeed quite obvious. We find that the admission of defendant's confession worked a serious injustice on the defendant and so taints the proceedings as to virtually deprive Harper of a fair trial. We can not allow her conviction to stand. The State argues that the overwhelming evidence of defendant's guilt prevented any serious prejudice to defendant and that the proper admission of another confession [5] rendered the tainted confession merely cumulative. That argument is belied by the State's use of the Levesque confession in its closing argument wherein the prosecutor remarked:

> [I]f Ann Levesque were going to lie, if she is proposing something other than the truthful testimony, why wouldn't she just go the whole route and say, oh, yeah, I talked with Pat Harper and she said, oh, sure, I killed Ricky Pinard. It doesn't make sense that Ann Levesque's testimony would be in that way unless it was a true accounting of that conversation.

Rather, the State was quite convincing in its argument that the Levesque confession was the most reliable due to its nature as a "half-confession." In addition, the defense presented evidence to explain the other potential confession as merely referencing defendant's past abortion.

Although we certainly cannot say that in the absence of the Levesque confession there would have been insufficient evidence to support defendant's conviction, neither can we say that the admission of the constitutionally tainted confession did not contribute to the jury's verdict. As such this error was prejudicial to defendant. *Accord Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (federal constitutional error cannot be held harmless unless beneficiary of error proves beyond a reasonable doubt that it did not contribute to the verdict). Together with the obviousness of the error in admitting Levesque's testimony, the prejudice to defendant resulting from that testimony requires that we vacate defendant's conviction.

The entry is:

Judgment vacated.

Case remanded for new trial.

ROBERTS, GLASSMAN and COLLINS, JJ., concurring.

WATHEN, C.J., with whom CLIFFORD, J., joins, dissenting.

I respectfully dissent. I disagree with the second prong of the Court's obvious error analysis. In my judgment, no serious injustice resulted from receiving in evidence defendant's admission that "she did not kill him, but ... she helped to bury the body." Other evidence of defendant's knowledge that she had a body buried in the floor of her shed is overwhelming. Defendant's oldest daughter, Melissa, testified that she saw defendant shoot Ricky Pinard and then helped defendant bury Pinard with ashes in the shed. She testified that from that day forward, the shed, formerly used as a children's play house, was converted to a storage area for wood and ashes. She testified further that after the burial, the shed was kept padlocked and defendant wanted only Melissa to retrieve wood from it. Blood stains were found on the mattress and on the wall in the bedroom where Melissa said the shooting occurred. Ricky Pinard's body was found buried in the wood shed, in ashes, exactly

---

**5.** In a letter that was read into evidence that defendant had sent to her boyfriend from the Windham Correctional Center, she wrote "I did kill somebody."

where Melissa said it was buried. Defendant made reference to having killed and buried Ricky Pinard to other people stating, "What do they think—that I killed him and buried him on the property?" In a letter to a boyfriend, defendant admitted that "I did kill somebody."

Against the factual backdrop presented in this case, defendant could not possibly have been harmed, nor could the fundamental fairness of the proceedings have been affected by evidence that she acknowledged some involvement in the burial. Even without her admission, any trier of fact would be compelled to conclude that she had some involvement in the burial of Ricky Pinard. Her admission added nothing to a conclusion that was otherwise ineluctable. I would affirm.