2009 ME 130

**STATE of Maine**

v.

**Eric S. LETALIEN.**

Supreme Judicial Court of Maine.

Argued: Feb. 10, 2009.
Decided: Dec. 22, 2009.

Janet T. Mills, Attorney General, Norman R. Croteau, District Attorney, Paul Stern, Dep. Atty. Gen. (orally), Laura Yustak Smith, Asst. Atty. Gen., Ronald W. Lupton, Asst. Atty. Gen., Patricia Reynolds Regan, Asst. Dist. Atty., Augusta, ME, for the State of Maine.

David M. Sanders, Esq. (orally), Livermore Falls, ME, for Eric S. Letalien.

Ronald W. Schneider, Jr., Esq., Bernstein, Shur, Sawyer & Nelson, Portland, ME, Zachary L. Heiden, Esq., Maine Civil Liberties Union, Portland, ME, for amicus curiae Maine Civil Liberties Union.

Kelly A. Ayotte, Attorney General, New Hampshire Department of Justice, Concord, NH, for amici curiae States of New Hampshire, Alabama, Florida, Hawaii, Idaho, Illinois, Michigan, Minnesota, New Mexico, and Nevada.

Gregory G. Katsas, Asst. Atty. Gen., Jonathan F. Cohn, Dep. Asst. Atty. Gen., Mark B. Stern, Esq., Samantha L. Chaifetz, Esq., United States Department of Justice, Washington, DC, for amicus curiae United States.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.*

Majority: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, MEAD, and GORMAN, JJ.

Concurring: SILVER, J.

LEVY, J.

[¶ 1] The State of Maine appeals from a judgment dismissing a criminal complaint charging Eric S. Letalien with failure to comply with the Sex Offender Registration and Notification Act of 1999 (SORNA of 1999) (Class D), 34–A M.R.S. § 11227(1) (2008). The District Court (Lewiston, *Stanfill, J.*) concluded that the retroactive application of SORNA of 1999, as applied to Letalien, violates the prohibition against ex post facto laws contained in both the United States and Maine Constitutions. The State asserts, among other things, that the trial court erred in conducting its ex post facto analysis of SORNA of 1999 on an as-applied basis and that a proper facial examination of SORNA of 1999 demonstrates that because the statute is civil in intent and effect, it may be applied retroactively without violating ex post facto principles. We agree that the determination of the constitutionality of the retroactive application of SORNA of 1999 depends on a facial examination of the statute, and not on an as-applied analysis as we previously suggested in *Doe v. District Attorney*, 2007 ME 139, 932 A.2d 552. We conclude that the statute imposes an ex post facto punishment as to offenders sentenced in the years before the effective date of SORNA of 1999 for whom registration was a required part of their sentence and who were subsequently made subject to the more burdensome requirements of SORNA of 1999 after its effective date of September 18, 1999. We therefore affirm the judgment.

## I. BACKGROUND

### A. District Court's Findings Regarding Letalien's Conviction

[¶ 2] The District Court found that on August 19, 1996, Eric S. Letalien pleaded guilty to gross sexual assault against a thirteen-year-old girl (Class A), 17–A M.R.S.A. § 253(1)(B) (Supp.1993), and on

* Clifford, J., sat at oral argument and participated in the initial conference while he was a Justice, and, on order of the Chief Justice, was authorized to continue his participation in his capacity as Active Retired Justice.

August 30, 1996, was sentenced to four years' incarceration with all but twenty months suspended, and four years' probation.[1] He was nineteen years old at the time of the offense. The District Court received the testimony of a clinical psychologist who performed a sex offender risk assessment on Letalien, and who concluded that Letalien presents the lowest possible risk of reoffending.

[¶ 3] The District Court found that because Letalien was convicted of gross sexual assault against a victim who was under the age of sixteen, he was subject to Maine's sex offender registration requirements. The District Court determined: "Defendant's conviction was in 1996, and thus the version of the sex offender registration statute in effect at the time of his conviction was enacted in 1995, effective in 1996 [the Sex Offender Registration and Notification Act (SORNA of 1995)]. P.L. 1995, ch. 680, § 13 (effective July 4, 1996) (codified at 34–A M.R.S.A. §§ 11101–11144 (Supp.1996))." Section 4 of P.L. 1995, ch. 680, provided that: "*As part of a sentence,* the court shall order every natural person who is a convicted sex offender ... to satisfy all requirements set forth in the Sex Offender Registration and Notification Act."[2] (Effective July 4, 1996) (codified at 17–A M.R.S.A. § 1152(2–C) (Supp.1996)) (emphasis added). SORNA of 1995 defined "[s]ex offender" to mean "an individual convicted of gross sexual assault if the

victim had not in fact attained 16 years of age at the time of the crime or an individual found not criminally responsible for committing gross sexual assault by reason of mental disease or defect if the victim had not in fact attained 16 years of age at the time of the crime." 34–A M.R.S.A. § 11103(5) (Supp.1996).

**B. SORA of 1991, SORNA of 1995, and SORNA of 1999**

[¶ 4] SORNA of 1995 was effective July 4, 1996, and its registration requirements applied to offenders sentenced on or after September 1, 1996. 34–A M.R.S.A. § 11102 (Supp.1996). The original sex offender registration law enacted in Maine, the Sex Offender Registration Act (SORA of 1991), applied to offenders sentenced from June 30, 1992, to August 31, 1996. *See* P.L. 1991, ch. 809, § 1 (codified at 34–A M.R.S.A. §§ 11001–11004 (Supp.1992)). SORA of 1991 did not state specifically that compliance with its requirements was to be made a part of an offender's criminal sentence, but it did provide that a sentencing court could, for good cause shown, waive the registration requirement. 34–A M.R.S.A. § 11003(4)(D) (Supp.1992) ("Registration may be waived only if ... [t]he sentencing court, for good cause shown, waives the registration requirement."). An identical sentencing waiver provision was included in SORNA of 1995.[3] *See*

---

**1.** Title 17–A M.R.S.A. § 253(1)(B) (Supp. 1993) provides:

 1. A person is guilty of gross sexual assault if that person engages in a sexual act with another person and:

 . . . .

 **B.** The other person, not the actor's spouse, has not in fact attained the age of 14 years.

**2.** The 1995 Public Law further required, "The court shall attach as a condition of probation that the convicted sex offender, as defined under Title 34–A, section 11103, satisfy all

responsibilities set forth in the Sex Offender Registration and Notification Act." P.L. 1995, ch. 680, § 6 (codified at 17–A M.R.S.A. § 1204(1-C)(Supp.1996)).

**3.** The waiver of registration provision established four avenues by which the registration requirement might be waived. Of the four, only a waiver at the time of sentencing by the sentencing court assured that an offender would not have to register at all:

 **6. Waiver of registration.** Registration may be waived only if:

P.L. 1995, ch. 680, § 13 (codified at 34-A M.R.S.A. § 11121(6)(D) (Supp.1996)). SORA of 1991 defined "[s]ex offender" to mean "an individual convicted of gross sexual assault if the victim had not attained the age of 16 years at the time of the crime." 34-A M.R.S. § 11002(2) (Supp. 1992). Unlike SORNA of 1995, SORA of 1991 did not also apply to individuals found not criminally responsible for committing gross sexual assault by reason of mental disease or defect if the victim had not attained sixteen years of age at the time of the crime. *Compare* 34-A M.R.S.A. § 11022(2) (Supp.1992), with 34-A M.R.S.A. § 11103(5) (Supp.1996).

[¶ 5] The District Court found that, pursuant to SORNA of 1995, Letalien was originally required to register his address with the Department of Public Safety, State Bureau of Identification, within fifteen days after his discharge from custody, and to update his registration if he moved. *See* 34-A M.R.S.A. § 11121(2), (3) (Supp. 1996). The registration requirement was to be in effect for fifteen years, except that Letalien could seek a waiver from the Superior Court by petitioning no sooner than five years after first having registered. 34-A M.R.S.A. § 11121(2), (6)(C) (Supp.

1996). The registration requirement could be waived upon a finding that the offender "has shown a reasonable likelihood that registration is no longer necessary and waiver of the registration requirement is appropriate." 34-A M.R.S.A. § 11121(6)(C) (Supp.1996). SORNA of 1995 required that upon release or discharge of a sex offender, notice be given to members of the public whom the department or a law enforcement agency determined appropriate "to ensure public safety." 34-A M.R.S.A. § 11143(1), (2) (Supp. 1996).

[¶ 6] Letalien served twenty months incarceration, less good time, without incident. In 1999, after he was released from incarceration but while he was still on probation, the Legislature enacted SORNA of 1999, which applied prospectively to a wider variety of offenses and imposed requirements on registrants that were more demanding than those of the prior versions of the sex offender statutes.[4] P.L. 1999, ch. 437, § 2 (effective Sept. 18, 1999) (codified at 34-A M.R.S.A. §§ 11201–11252 (Pamph.1999)). SORNA of 1999 recognized two categories of offenders—"sex offender[s]" and "sexually violent predator[s]"—based on the crimes

**A.** The conviction is vacated;
**B.** A full and free pardon is granted;
**C.** The Superior Court, upon the petition of the sex offender, waives the registration requirement.
A sex offender may not petition for waiver of the registration requirement until at least 5 years after the sex offender is first required to register.
A sex offender may petition once a year for waiver of the registration requirement.
Before waiving the registration requirement, the court must determine that the sex offender has shown a reasonable likelihood that registration is no longer necessary and waiver of the registration requirement is appropriate. The court shall consider the sex offender's progress in treatment and may request an independent forensic evalu-

ation provided through the State Forensic Service. If the court orders an independent forensic evaluation, the court shall reimburse the State Forensic Service for the cost of the evaluation and order the sex offender to reimburse the court for the cost of the evaluation; or
**D.** The sentencing court, for good cause shown, waives the registration requirement. 34-A M.R.S.A. § 11121(6)(A)-(D) (Supp. 1996); *see also* 34-A M.R.S.A. § 11003(4)(A)-(D) (Supp.1996). The corresponding provision in SORA of 1991 was codified at 34-A M.R.S.A. § 11003(4)(A)-(D) (Supp.1992).

4. We previously discussed the legislative history relating to sex offender laws in Maine at length in *Doe v. District Attorney*, 2007 ME 139, ¶¶ 10–19, 932 A.2d 552, 555–58.

for which offenders were convicted. 34–A M.R.S.A. §§ 11202, 11203(5), (8) (Pamph. 1999). "Sex offender[s]" were required to register for ten years, and "sexually violent predator[s]" were required to register for life. 34–A M.R.S.A. § 11225(1), (2) (Pamph.1999). The public notification requirements were the same as under SORNA of 1995. 34–A M.R.S.A. § 11251 (Pamph.1999); *see also* 34–A M.R.S.A §§ 11142, 11143 (Supp.1996). Relief from the duty to register was available only in the event of a pardon, or if the offender's conviction was reversed, vacated, or set aside. 34–A M.R.S.A. § 11225(4) (Pamph. 1999). Sentencing judges no longer had the discretion to waive the registration requirement for offenders sentenced on or after September 18, 1999. *See* 34–A M.R.S.A. § 11225 (Pamph.1999).

[¶ 7] In 2001, Letalien became subject to the more stringent requirements of SORNA of 1999 as a result of a legislative amendment that made the law apply retroactively to all persons sentenced for sex offenses or sexually violent offenses on or after June 30, 1992, and before September 18, 1999. P.L. 2001, ch. 439, § 000–7 (effective Sept. 21, 2001) (codified at 34–A M.R.S.A. § 11202 (Pamph.2001)); *see also* P.L. 2001, ch. 439, §§ OOO–10 to OOO–12 (codified at 34–A M.R.S.A. §§ 11203(8), 11222(2–A), 11225(1) (Pamph.2001)). SORA of 1991 and SORNA of 1995 were repealed in their entirety. P.L. 2001, ch. 439, § OOO–5 (effective Sept. 21, 2001).

[¶ 8] Because SORNA of 1999, as amended, deemed the crime for which Letalien was convicted in 1996 a "sexually violent offense," in 2001 Letalien was classified as a "sexually violent predator" and the duration of his duty to register increased from fifteen years to his entire lifetime. *See* 34–A M.R.S.A. §§ 11202, 11203(7)(A), (8)(A), 11225(2) (Pamph.2001). Letalien also lost the right to seek a waiver of the registration and notification provisions. *See* 34–A M.R.S.A. § 11225(4) (Pamph.2001). In addition, while Letalien was previously required to contact local law enforcement to provide his new address only if and when it changed, SORNA of 1999 mandated that Letalien report in person to his local law enforcement agency every ninety days to verify his domicile, residence, place of employment, and college or school being attended; to be fingerprinted; and to provide a photograph of himself. *Compare* 34–A M.R.S.A. § 11222(4) (Pamph.2001), *with* 34–A M.R.S.A. § 11003(3) (Supp.1992).

[¶ 9] In its first regular legislative session in 2003, the Legislature, as part of a series of further revisions to SORNA of 1999, enacted the requirement that the State Bureau of Identification maintain an Internet site posting information regarding registrants. P.L. 2003, ch. 371, § 7 (effective Sept. 13, 2003) (codified at 34–A M.R.S.A. § 11221(9) (Pamph.2003)). In addition, the Legislature expanded a registrant's duty to inform the Bureau of a change in domicile, requiring disclosure to the Bureau if the registrant establishes a new place of employment or attends a new school. *See* P.L. 2003, ch. 371, § 10 (effective Sept. 13, 2003) (codified at 34–A M.R.S.A. § 11222(5) (Pamph.2003)).

[¶ 10] The Legislature enacted other changes in its second session in 2003: it required the registrant to notify local police within twenty-four hours of beginning employment or school, or establishing a residence, and it shortened the time limit for notification to the Bureau from ten days to five days. *See* P.L. 2003, ch. 711, §§ C–21, C–22 (effective July 30, 2004) (codified at 34–A M.R.S.A. §§ 11222, 11223 (Pamph.2004)). Additionally, it eliminated the requirement, effective July 30, 2004, that SORNA of 1999 registration be made a part of an offender's criminal sentence.

*See* P.L. 2003, ch. 711, § B–13 (codified at 17–A M.R.S.A. § 1152(2–C) (Supp.2004)). "'The 'as part of the sentence' language was deleted and replaced with the following language: *'At the time the court imposes a sentence,* the court shall order every natural person convicted of a sex offense or a sexually violent offense . . . to satisfy all requirements set forth in the Sex Offender Registration and Notification Act of 1999.'" *State v. Johnson,* 2006 ME 35, ¶ 14, 894 A.2d 489, 492 (quoting 17–A M.R.S.A. § 1152(2–C) (Supp.2004)).

[¶ 11] The Legislature made further changes in 2005, extending application of SORNA of 1999 retroactively to January 1, 1982. *See* P.L. 2005, ch. 423, § 1 (effective Sept. 17, 2005) (codified at 34–A M.R.S. § 11202 (2005)). It also elevated the classification of repeated failure to comply with SORNA of 1999, making a second failure to comply a Class C offense and a failure to comply more than twice a Class B offense. *See* P.L. 2005, ch. 423, § 23 (effective Sept. 17, 2005) (codified at 34–A M.R.S. § 11227 (2005)).

[¶ 12] In 2007, the Legislature enacted 17–A M.R.S. § 261, providing that a registered sex offender whose victim was under the age of fourteen at the time of the offense, commits a crime (Class E) by intentionally or knowingly having direct or indirect contact with any child under the age of fourteen. P.L. 2007, ch. 393, § 1 (effective Sept. 20, 2007) (codified at 17–A M.R.S. § 261(1) (2007)). The penalty is enhanced if the contact occurs in "a sex offender restricted zone," such as a school or playground. 17–A M.R.S. § 261(2), (4) (2007). Letalien is subject to the prohibition of section 261 because his victim was thirteen years old at the time of the offense.

## C. The District Court's Conclusions Regarding Retroactive Application of SORNA of 1999

[¶ 13] The District Court found that Letalien registered for the first time under SORNA of 1999 in March 2003, and that he signed an acknowledgement of his duty to register and keep his registration updated in April 2003. In July 2007, Letalien was arrested and charged with failure to comply with SORNA of 1999, *see* 34–A M.R.S. § 11227(1) (2008), after he did not verify his registration as required. After entering a plea of not guilty, Letalien moved to dismiss the charge, challenging the retroactive application of SORNA of 1999 against him as a violation of various provisions of the United States and Maine Constitutions, including the Maine Constitution's prohibition against ex post facto laws, Me. Const. art. I, § 11, and the corresponding prohibition in the United States Constitution, U.S. Const. art. I, § 10, cl. 1.

[¶ 14] The District Court granted Letalien's motion to dismiss the criminal complaint, concluding that as applied to him, SORNA of 1999 was unconstitutional as an ex post facto law. The court issued comprehensive factual findings that detailed the negative effects that sex offender registration and Internet posting have had on Letalien's ability to obtain and maintain employment, his role as a husband and parent, and his standing in the community.[5] In its legal analysis, the court relied on our decision in *Doe,* 2007 ME 139, 932 A.2d 552, and concluded that Letalien met his burden of demonstrating by the "clearest proof" that despite the Legislature's civil intent in enacting SOR-

5. Because, for reasons to be discussed, we undertake a facial review of the challenged statute, we do not repeat the specific findings the District Court made in support of its decision to dismiss the complaint.

NA of 1999 and making it apply retroactively, the effect of SORNA of 1999 on him is so punitive as to overcome its civil characterization. The court ruled that the retroactive application of SORNA of 1999 violates the ex post facto clauses of both the United States and Maine Constitutions. The State appeals.

## II. DISCUSSION

### A. Standard of Review

[¶ 15] We review de novo a challenge to the validity of a statute as a matter of law. *State v. Haskell,* 2001 ME 154, ¶ 3, 784 A.2d 4, 7. "A statute is presumed to be constitutional and the person challenging the constitutionality has the burden of establishing its infirmity." *Kenny v. Dep't of Human Servs.,* 1999 ME 158, ¶ 7, 740 A.2d 560, 563. "We must assume that the Legislature acted in accord with constitutional requirements if the statute can reasonably be read in such a way, notwithstanding other possible unconstitutional interpretations of the same statute." *Haskell,* 2001 ME 154, ¶ 4, 784 A.2d at 7.

### B. Ex Post Facto Analysis

1. The Ex Post Facto Provisions of the United States and Maine Constitutions are Coextensive

[¶ 16] The United States Constitution directs: "No State shall ... pass any ... ex post facto Law." U.S. Const. art. I, § 10, cl. 1. Similarly, the Maine Constitution provides, "The Legislature shall pass no ... ex post facto law." Me. Const. art. I, § 11. The prohibition on ex post facto laws "applies only to penal statutes which disadvantage the offender affected by them." *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990).

[¶ 17] In *Collins,* the United States Supreme Court comprehensively reviewed the history of interpretation of the ex post facto clause. *Id.* at 40–52, 110 S.Ct. 2715. Summarizing, the Court stated that the ex post facto clause prohibits laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Id.* at 43, 110 S.Ct. 2715. The *Collins* Court described the criteria to be used for measuring whether or not a law imposing requirements on persons previously convicted of a crime is constitutionally prohibited as ex post facto:

It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto.

*Id.* at 42, 110 S.Ct. 2715 (quoting *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925)).

[¶ 18] The *Collins* criteria are stated in the alternative; violation of any one prohibition renders a law a violation of the ex post facto clause. The constitutional prohibition on "any statute ... which makes more burdensome the punishment for a crime, after its commission" looks to, among other things, the burdens subsequently imposed on persons previously sentenced. *Id.*

[¶ 19] Shortly after *Collins,* we adopted a similarly-worded standard for ex post facto analysis in *State v. Joubert,* 603 A.2d 861, 869 (Me.1992). We stated that an ex post facto violation exists only:

i) if the new statute punishes as a crime an act that was innocent when done, or

ii) if it makes more burdensome the punishment for a crime after its commission, or iii) if it deprives one charged with crime of a defense available according to law at the time the act was committed.

*Id.* (citing *Collins*, 497 U.S. at 42, 110 S.Ct. 2715).

 [¶ 20] Letalien contends that we should abandon the view that the Maine Constitution's ex post facto prohibition is coextensive with the Federal Constitution's prohibition. He urges us to construe the Maine Constitution as affording greater protection to individuals than its federal counterpart because the ex post facto clause appears in the Maine Constitution's Declaration of Rights article, whereas the federal ex post facto clause is set forth as a limitation on the power of the legislative branch in the article establishing legislative authority. *Compare* Me. Const. art. I, § 11, *with* U.S. Const. art. I, § 9, cl. 3, § 10, cl. 1.

[¶ 21] That the framers of the Federal Constitution chose to include a prohibition on ex post facto laws in the body of the Constitution itself suggests the high degree of importance they attached to it. The ex post facto clause, along with the protection of trial by jury in criminal cases, U.S. Const. art. III, § 2, cl. 3; ban on religious tests, U.S. Const. art. VI, cl. 3; ban on bills of attainder, U.S. Const. art. I, § 9, cl. 3, § 10, cl. 1; the narrow definition of treason, U.S. Const. art. III, § 3, cl. 1; and the writ of habeas corpus, U.S. Const. art. I, § 9, cl. 2; were all included in the original Constitution and were intended by the framers of the Constitution to protect individual liberty. *See* Leonard W. Levy, Origins of the Bill of Rights 28–29 (1999). These protections were placed within vari-

ous articles of the Constitution that, by design, did not have a separate article declaring individual rights based on the belief that the Constitution's function was to provide for the existence of the federal government rather than to enumerate rights not divested of the people. *See* Laurence H. Tribe, American Constitutional Law § 1–3 at 8–9 n. 8 (3d ed. 2000); *see also* Levy, Origins of the Bill of Rights 20–21. James Madison explained that the Constitutional Convention had not adopted a bill of rights for fear that a "positive declaration of some of the most essential rights" might be construed as exclusive, thus denying the public of any unexpressed rights. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 578, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (quoting 5 Writings of James Madison 271 (G. Hunt ed. 1904)).

[¶ 22] Many people who opposed ratification of the Constitution did so because of the absence of a bill of rights that would safeguard basic freedoms. Tribe, American Constitutional Law § 1–3 at 8–9 n. 8; *see also New York Times Co. v. United States*, 403 U.S. 713, 715–17, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Black, J. concurring). The original Constitution was ratified only because crucial states were willing to accept the promise of a bill of rights in the form of subsequent amendments to the Constitution. Levy, Origins of the Bill of Rights 31–32.

[¶ 23] The framers' decision to include the ex post facto clause in the body of the Constitution adopted in 1787, and not to defer consideration to the amendment process that would follow, is evidence that the framers viewed the federal ban on ex post facto laws as fundamental to the protection of individual liberty.[6]

---

6. Writing in *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 137–38, 3 L.Ed. 162 (1810), Chief

Justice John Marshall explained that the framers intended the ex post facto clause to

[¶ 24] Similarly, the placement of a nearly-identically-worded ex post facto prohibition in the Declaration of Rights section of the Maine Constitution more than thirty years after the adoption of the Bill of Rights reflects that the framers of the Maine Constitution also regarded the prohibition as being fundamental to the protection of individual liberty. As originally adopted, the Maine Constitution declares the rights of individuals in an article expressly designated for that purpose. Unlike the framers of the Federal Constitution, the framers of the Maine Constitution had no reason to defer consideration of the ex post facto prohibition or other protections related to individual rights to an amendment process that would take place after it was adopted. Accordingly, the location of the federal and Maine ex post facto prohibitions within their respective constitutions is a function of history and the manner in which each constitution was developed, and does not establish that the Maine prohibition was intended to afford greater or different protections than the federal prohibition.

[¶ 25] Thus, we conclude that the ex post facto clauses of the Maine and United States Constitutions are interpreted similarly and are coextensive, and a statute violates the prohibition against ex post facto laws if it: (1) punishes as criminal an act that was not criminal when done, (2) makes more burdensome the punishment for a crime after it has been committed, or (3) deprives the defendant of a defense that was available according to law at the time the act was committed. *See Collins,* 497 U.S. at 42, 110 S.Ct. 2715; *State v. Chapman,* 685 A.2d 423, 424 (Me. 1996); *Joubert,* 603 A.2d at 869.

2. Introduction to Ex Post Facto Analysis

[¶ 26] Letalien contends that the retroactive application of SORNA of 1999 violates the prohibitions against ex post facto laws found in both the United States and Maine Constitutions because SORNA of 1999's registration and notification provisions, which were not in effect at the time of his conviction or sentencing, render the punishment for his crime more burdensome. The State contends, in part, that the retroactive application of the law to Letalien, involving, among other things, his inclusion in Maine's Internet registry, does not violate ex post facto or due process protections under the Supreme Court's decisions in *Smith v. Doe,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), and *Connecticut Department of Public Safety v. Doe,* 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003); that the retroactive application of SORNA's quarterly in-person verification requirement was previously determined constitutional by this Court in *Haskell,* 2001 ME 154, 784 A.2d 4; and that we should reconsider and overrule our decision in *Doe,* 2007 ME 139, ¶¶ 21–37, 932 A.2d at 558–63, which treated a due process challenge to SORNA as an ex post facto challenge and remanded the case for an evaluation of the statute on an as-applied basis.

[¶ 27] The current version of SORNA of 1999 is a result of over eighteen years of legislative efforts to develop and refine an effective process for the registration of sex offenders in Maine. Those careful legislative efforts to improve the law in order to achieve public safety, consistent with constitutional requirements, are continuing. This year, the Legislature again amended SORNA of 1999 and related statutes, P.L.

limit legislative power to guard against "violent acts which might grow out of the feeling

of the moment."

2009, ch. 365, §§ A–1 to B–22 (effective Sept. 12, 2009), to address concerns about application of the law to offenses committed between 1988 and 1992, before SORA of 1991 was in effect.

[¶ 28] The current SORNA of 1999 divides registrants into two categories: ten-year registrants and lifetime registrants. 34–A M.R.S. § 11203(5), (8) (2008). Ten-year registrants are those convicted and sentenced for committing a "[s]ex offense" defined by statute as encompassing certain offenses. 34–A M.R.S. § 11203(5), (6)(B) (2008). Lifetime registrants are those convicted and sentenced for committing either a "[s]exually violent offense," which is also defined by statute as encompassing certain offenses, or a "[s]ex offense when the person has a prior conviction for or an attempt to commit an offense that includes the essential elements of a sex offense or sexually violent offense." 34–A M.R.S. § 11203(7), (8) (2008). As previously noted, SORNA does not allow for a waiver of its requirements, nor does it condition an offender's duty to register or verify on an individualized determination of the offender's risk of re-offending; rather, its requirements are mandatory and attach strictly as a consequence of the conviction of a crime identified by the statute. 34–A M.R.S. §§ 11203(5)-(8), 11222 (2008). In contrast to ten-year registrants, who must verify their information once annually, lifetime registrants must verify their registration information in person every ninety days and within five days of receipt of a verification request from the local law enforcement agency.[7] 34–A M.R.S. § 11222(4)(C) (2008).

---

7. Each lifetime registrant must verify his or her "domicile, residence, place of employment and college or school being attended" and provide a recent photograph and be fingerprinted. 34–A M.R.S. § 11222(4)(C), (D) (2008). If a registrant changes domicile, residence, place of employment, or college or school attended, he or she must notify the Bureau in writing within five days of the change and must notify the local law enforcement agency within twenty-four hours of the change. 34–A M.R.S. § 11222(5) (2008). He or she must also pay a $25 annual fee. 34–A M.R.S. § 11226 (2008).

The information that registrants provide the Bureau and their local law enforcement agency is then included in the sex offender registry maintained by the Bureau. 34–A M.R.S. § 11221 (2008). The registry contains the following information on each registrant:

 A. The registrant's name, aliases, date of birth, sex, race, height, weight, eye color, mailing address and physical location of expected domicile and residence;

 B. Place of employment and college or school being attended, if applicable, and the corresponding address and location;

 C. Offense history;

 D. Notation of any treatment received for a mental abnormality or personality disorder;

 E. A photograph and set of fingerprints;

 F. A description of the offense for which the registrant was convicted, the date of conviction and the sentence imposed; and

 G. Any other information the bureau determines important.

34–A M.R.S. § 11221(1)(A)-(G) (2008). The Bureau must post on the Internet the following information concerning registrants:

 (1) The registrant's name, date of birth and photograph;

 (2) The registrant's city or town of domicile and residence;

 (3) The registrant's place of employment and college or school being attended, if applicable, and the corresponding address and location; and

 (4) The statutory citation and name of the offense for which the registrant was convicted.

34–A M.R.S. § 11221(9)(A)(1)-(4) (2008). On request, the Bureau must provide additional information:

Upon receiving a written request that includes the name and date of birth of a registrant, the bureau shall provide the following information concerning a registrant to the requestor:

 (1) The registrant's name, aliases, date of birth, sex, race, height, weight, eye color, mailing address and physical location of domicile and residence;

[¶ 29] As we have already noted, the protection offered by the ex post facto clause of the Maine Constitution is co-extensive with that of the United States Constitution.[8] *See, e.g., Doe,* 2007 ME 139, ¶ 26 n. 6, 932 A.2d at 560; *Haskell,* 2001 ME 154, ¶ 6 n. 5, 784 A.2d at 8; *Chapman,* 685 A.2d at 424–25; *Joubert,* 603 A.2d at 868–69; *State v. Vainio,* 466 A.2d 471, 475–76 (Me.1983); *State v. Myrick,* 436 A.2d 379, 382–83 (Me.1981). In both *Haskell,* 2001 ME 154, ¶¶ 8–22, 784 A.2d at 8–16, and *Doe,* 2007 ME 139, ¶¶ 22–28, 932 A.2d at 559–61, we analyzed SORNA of 1999 following the two-step "intent/effects" test employed by the United States Supreme Court in *Smith,* 538 U.S. at 92, 123 S.Ct. 1140, and *Hudson v. United States,* 522 U.S. 93, 99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). Having concluded that SORNA was intended to be a civil, regulatory statute, we next applied the seven factors set forth in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), to determine whether, notwithstanding the Legislature's civil intent, it has been established by "clearest proof" that the effects of SORNA of 1999 are so punitive as to overcome the civil characterization. *Doe,* 2007 ME 139, ¶¶ 24, 27–28, 932 A.2d at 560–61; *Haskell,* 2001 ME 154, ¶¶ 12–13, 784 A.2d at 10–11.

[¶ 30] In light of the considerable deference we afford to the Legislature's express statement that SORNA of 1999 is intended to "protect the public from poten-tially dangerous registrants by enhancing access to information concerning those registrants," 34–A M.R.S. § 11201 (2008), and because the Legislature has placed SORNA of 1999 entirely outside of the Criminal Code, we find no reason to depart from our prior decisions that determined that the law was intended by the Legislature to be a civil regulatory statute. *See State v. Cosgro,* 2008 ME 64, ¶ 3 n. 1, 945 A.2d 1221, 1223; *Doe,* 2007 ME 139, ¶ 27, 932 A.2d at 560; *Haskell,* 2001 ME 154, ¶ 12, 784 A.2d at 10. Accordingly, we direct our focus to the second step of the inquiry and examine SORNA's effects.

### 3. *Mendoza–Martinez* Factors

[¶ 31] In the second step of the analysis, a statute that is intended to be civil will be found to be an ex post facto law only if the "party challenging the statute provides 'the clearest proof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'" *Kansas v. Hendricks,* 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (quoting *United States v. Ward,* 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)) (alterations in original). The seven *Mendoza–Martinez* factors provide a "useful framework" for this determination. *Smith,* 538 U.S. at 97, 123 S.Ct. 1140. They are:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a pun-

---

(2) The registrant's place of employment and college or school being attended, if applicable, and the corresponding address and location;
(3) A description of the offense for which the registrant was convicted, the date of conviction and the sentence imposed; and
(4) The registrant's photograph.
34–A M.R.S. § 11221(9)(B)(1)-(4) (2008).

8. After the District Court's judgment was entered in this case, two other jurisdictions relied solely on the ex post facto clauses contained in their state constitutions in determining that the retroactive application of their states' sex offender laws is unconstitutional. *See Wallace v. Indiana,* 905 N.E.2d 371, 384 (Ind.2009); *Doe v. Alaska,* 189 P.3d 999, 1019 (Alaska 2008).

ishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned. *Mendoza–Martinez*, 372 U.S. at 168–69, 83 S.Ct. 554 (footnotes omitted).

[¶ 32] The *Mendoza–Martinez* decision recognized that although "all [the factors are] relevant to the inquiry, [they] may often point in differing directions." *Id.* at 169, 83 S.Ct. 554. As one commentator has explained, "This test is not applied according to any precise mathematical formulation, . . . and at various times the courts have emphasized particular factors over others." Erin Murphy, *Paradigms of Restraint*, 51 Duke L.J. 1321, 1349 (2008). "Sometimes one factor will be considered nearly dispositive of punitiveness 'in fact,' while sometimes another factor will be crucial to a finding of nonpunitiveness." *Doe v. Pataki*, 120 F.3d 1263, 1275 (2d Cir. 1997), *amended on other grounds by* 120 F.3d at 1285 (2d Cir.1997). Indeed, in *Smith*, the Court considered five of the factors, but it recognized that one factor—the statute's "rational connection to a non-punitive purpose"—was the most significant in its determination that the effects of Alaska's sex offender registration statute are not punitive. 538 U.S. at 102, 123 S.Ct. 1140 (citing *United States v. Ursery*, 518 U.S. 267, 290, 116 S.Ct. 2135, 135 L.Ed.2d 549(1996)).

4. "As–Applied" Versus "Facial" Analysis

[¶ 33] Despite the Supreme Court's reference in *Smith* to record evidence regarding the circumstances of the individual offenders in its analysis of whether Alaska's act imposed an affirmative disability or restraint, *Smith*, 538 U.S. at 99–100, 123 S.Ct. 1140 ("Here, we inquire how the effects of the Act are felt by those subject to it."), ex post facto challenges to a statute "must be considered in relation to the statute on its face," absent evidence of legislative intent as to the penal nature of the statute, and not on an as-applied basis. *Mendoza–Martinez*, 372 U.S. at 169, 83 S.Ct. 554. Our opinion in *Doe* indicated that subsequent ex post facto challenges to SORNA of 1999 would require courts to consider whether the law has a punitive effect as applied to the individual defendant or defendants making the challenge. *See Doe*, 2007 ME 139, ¶¶ 28–37, 932 A.2d at 561–63.

[¶ 34] We recognize today that the as-applied ex post facto analysis suggested in *Doe* is inconsistent with precedent. Moreover, it will result in inconsistent outcomes and unnecessarily invite individuals to challenge the constitutionality of the statute based on their personal circumstances. If courts entertain as-applied challenges, SORNA of 1999 might be found constitutional when applied retroactively to some individuals, but unconstitutional when applied retroactively to others, with the fulcrum of each decision being the personal circumstances of each offender. The ex post facto prohibition is intended to act as a check on the exercise of legislative authority as it affects broad categories of persons, and is not intended to create an individual right to challenge a retroactive law based on the effect that the law has on each person's individual circumstances. For ex post facto purposes, SORNA of 1999 is properly evaluated on its face, and not in relation to how it has been applied against Letalien or other individuals. To the extent our opinion in *Doe* can be read to suggest the contrary, it is overruled.

Thus, we turn to consider whether it has been established by clearest proof that the effects of SORNA of 1999 are so punitive as to overcome the civil characterization.

5. Facial Analysis of SORNA of 1999 in Conjunction with the Seven *Mendoza–Martinez* Factors

a. Affirmative Disability or Restraint

[¶ 35] The first *Mendoza–Martinez* factor is whether SORNA of 1999 involves an affirmative disability or restraint. 372 U.S. at 168, 83 S.Ct. 554. "Here, we inquire how the effects of the [a]ct are felt by those subject to it. If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Smith*, 538 U.S. at 99–100, 123 S.Ct. 1140.

[¶ 36] In *Smith*, the Supreme Court concluded that this factor indicated that the Alaska statute was civil because it imposes no physical restraints, it restrains no activities sex offenders may pursue, and it leaves them free to change jobs or residences. *Id.* at 100, 123 S.Ct. 1140. The Court further concluded that any occupational or housing disadvantages that could occur as a result of the procedures employed under the statute would occur in any event because the information about the individual's conviction is already in the public domain. *Id.* Any adverse consequences flow not from the availability of the information by virtue of the Alaska sex offender statute, but from the fact of a criminal conviction that is already a matter of public record. *Id.* at 100–01, 123 S.Ct. 1140.

[¶ 37] Letalien asserts that the Alaska statute is distinguishable because it does not contain provisions similar to those in SORNA of 1999 requiring quarterly, in-person verification procedures. We agree. These provisions, which require lifetime registrants, under threat of prosecution, to physically appear at their local law enforcement agencies within five days of receiving a notice by mail, place substantial restrictions on the movements of lifetime registrants and may work an "impractical impediment that amounts to an affirmative disability." *See Doe*, 2007 ME 139, ¶ 32, 932 A.2d at 562. The majority in *Smith* concluded that the procedure at issue, which did not require updates to be made in person, did not amount to a form of "supervision." 538 U.S. at 101, 123 S.Ct. 1140. Here, however, quarterly, in-person verification of identity and location of home, school, and employment at a local police station, including fingerprinting and the submission of a photograph, for the remainder of one's life, is undoubtedly a form of significant supervision by the state. In this respect, SORNA of 1999 imposes a disability or restraint that is neither minor nor indirect.[9]

---

9. Of the three appellate decisions the State cites in support of its position that quarterly in-person reporting for life does not, standing alone or in conjunction with other considerations, render SORNA of 1999 punitive, two are distinguishable because the relevant laws afforded offenders the opportunity to seek the early termination of the registration requirement. *See Doe v. Pataki*, 120 F.3d 1263, 1284–85 (2d Cir.1997), *amended on other grounds by* 120 F.3d 1263, 1285 (2d Cir.1997) (addressing a duty to register in person every ninety days for a minimum of ten years); *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367, 378 (1995) (noting that the statute's lifetime registration requirements could be terminated early if an offender is offense-free for fifteen years and "can persuade the court that he or she is not likely to pose a threat to the safety of others"). In the third, *Doe v. Otte*, 259 F.3d 979, 987 (9th Cir.2001), the Ninth Circuit Court of Appeals ruled that quarterly in-person verification does create an affirmative disability, but its decision was subsequently reversed by the Supreme Court in *Smith v. Doe*, 538 U.S. 84, 106, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003). In *Smith*, the Court noted that the Ninth Circuit opinion had mistakenly construed the Alaska statute as requiring in-per-

### b. Sanctions Historically Considered Punishment

[¶ 38] For the second *Mendoza–Martinez* factor, we consider whether sanctions imposed by SORNA of 1999 have historically been regarded as punishment. 372 U.S. at 168, 83 S.Ct. 554. In *Smith*, the Supreme Court considered Alaska's statute in light of the colonial punishments of public shaming, humiliation, and banishment, and concluded that the dissemination of truthful information in furtherance of a legitimate governmental objective could not be considered punishment. *See Smith*, 538 U.S. at 97–98, 123 S.Ct. 1140. The use of the Internet to disseminate sex offender registrant information did not alter the Supreme Court's conclusion. *See id.* at 99, 123 S.Ct. 1140. The Court found that "[t]he purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender. Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation." *Id.* Maine's statutory scheme is indistinguishable in this respect and, for the reasons articulated by the Supreme Court in *Smith*, we conclude that Internet posting pursuant to SORNA of 1999 is not punitive in purpose or effect. However, Internet posting aside, there is another aspect of Maine's statutory scheme that is distinguishable from that considered in *Smith*.

[¶ 39] The unique history of the development of sex offender registration laws in Maine is integral to the question of whether the retroactive application of SORNA of 1999 to offenders who were sentenced on or after June 30, 1992, and before September 18, 1999, should be regarded as punishment.[10] SORA of 1991 authorized sentencing judges, as part of the sentencing process, to waive an offender's duty to register. *See* 34–A M.R.S.A. § 11003(4)(D) (Supp.1992). This same sentencing authority was continued in SORNA of 1995. *See* 34–A M.R.S. § 11121(6)(D) (Supp.1996). In addition, a statutory provision enacted contemporaneously with SORNA of 1995 explicitly provided: "*As part of a sentence*, the court shall order every natural person who is a convicted sex offender ... to satisfy all requirements set forth in the Sex Offender Registration and Notification Act." 17–A M.R.S.A. § 1152(2–C) (Supp.1996) (emphasis added) (enacted by P.L. 1995, ch. 680, § 4).

[¶ 40] As previously discussed, the District Court determined that Letalien's "conviction was in 1996, and thus the version of the sex offender registration statute in effect at the time of his conviction was enacted in 1995, effective in 1996

son updates. *Id.* at 101, 123 S.Ct. 1140. *See also Wallace*, 905 N.E.2d at 379–80 (concluding that a registration scheme that requires, among other things, annual in-person registration imposes an affirmative disability or restraint); *Doe*, 189 P.3d at 1009 (concluding that quarterly in-person verification is an affirmative disability or restraint that "treats offenders not much differently than the state treats probationers and parolees subject to continued state supervision") (quotation marks omitted). Nor are we persuaded that the two trial court decisions relied on by the State, both from District Courts, should control our analysis. *See Doe v. Bredesen*, No. 3:04–CV–566, 2006 WL 849849, at **8–9, 2006 U.S. Dist. Lexis 21855, at **24–25 (E.D.Tenn. Mar. 28, 2006) (concluding that quarterly in-person verification for life does not impose a disability or restraint); *Creekmore v. Attorney General of Tex.*, 341 F.Supp.2d 648, 661 (E.D.Tex.2004) (concluding that Texas's quarterly "registration requirements alone are not enough to render the statute punitive in effect").

**10.** SORA of 1991 became effective June 30, 1992, *see* P.L. 1991, ch. 809, § 1, and SORNA of 1999 became effective September 18, 1999, *see* P.L. 1999, ch. 437, § 2.

[SORNA of 1995]. P.L. 1995, ch. 680, § 13 (effective July 4, 1996) (codified at 34–A M.R.S.A. §§ 11101–11144 (Supp.1996)).” Section 4 of P.L. 1995, ch. 680, provided: “As part of a sentence, the court shall order every natural person who is a convicted sex offender … to satisfy all requirements set forth in the Sex Offender Registration and Notification Act.” P.L. 1995, ch. 680, § 4 (codified at 17–A M.R.S.A. § 1152(2–C) (Supp.1996)). Although this provision was in effect on August 30, 1996, the day Letalien was convicted, the separate section of the public law establishing the registration requirements provided, “This chapter applies to all sex offenders sentenced or placed in institutional confinement under Title 15, section 103 on or after September 1, 1996.” P.L. 1995, ch. 680, § 13 (codified at 34–A M.R.S.A. § 11102 (Supp.1996)). Thus, while the sentencing provision in the 1995 Public Law was in effect and controlled Letalien’s sentence imposed on August 30, 1996, the registration provisions of SORNA of 1995 specifically applied to sex offenders sentenced on or after September 1, 1996.

[¶ 41] In this appeal, the State has not assigned as error the District Court’s legal conclusion that Letalien was subject to SORNA of 1995. Nonetheless, its brief proceeds from the premise that Letalien’s “registration requirement arose initially under Chapter 11 [(SORA of 1991)].” Letalien’s brief on appeal also treats SORA of 1991 as the applicable law.

[¶ 42] We have not previously addressed whether offenders who were sentenced on or after July 4, 1996, but before September 1, 1996, were subject to SORNA of 1995 through the operation of 17–A M.R.S.A. § 1152(2–C) (Supp.1996). We decline to resolve the question in this case because it has not been cited as error, it has not been briefed, and it does not bear on the outcome. In addition, the registration requirements for Letalien were the same under both laws. Whether Letalien was originally subject to SORA of 1991 or SORNA of 1995, sex offender registration was an integral part of the sentencing process and, thus, the resulting sentence. Unlike the sentence imposed on offenders after the effective date of SORNA of 1999 (September 18, 1999), the sentences of offenders imposed after the effective date of SORA of 1991 (June 30, 1992), and continuing after the effective date of SORNA of 1995 (July 4, 1996), rested, at least in part, on the sentencing court’s exercise of judicial discretion. We thus reject the State’s contention that those offenders “whose registration obligations [under SORNA of 1999] arose after they had been sentenced received no prior court ‘determination’ or ‘sentence’ to comply with SORNA.”

[¶ 43] Because sex offender registration was required to be part of Letalien’s criminal sentence, the retroactive application of SORNA of 1999’s requirements to Letalien modified and enhanced a portion of his criminal sentence. The requirement that he register for fifteen years, with the possibility of early termination after five years, has been superseded by the requirement that he register for life with no possibility of early termination. Although the State correctly points out that courts may order defendants to comply with various civil regulatory provisions as a condition of probation if the court imposes a partially or wholly suspended sentence, the fact remains that sex offender registration was required to be an integral part of the original sentencing process and resulting sentence for Letalien’s crime of gross sexual assault at the time of his conviction. Because of this, the retroactive application of SORNA of 1999 “makes more burdensome the punishment for a

crime after its commission." *Joubert*, 603 A.2d at 869 (quoting *Collins*, 497 U.S. at 42, 110 S.Ct. 2715). The second *Mendoza–Martinez* factor suggests that SORNA of 1999 is punitive as applied to those offenders who were originally made subject to SORA of 1991 or SORNA of 1995.[11]

### c. Finding of Scienter

[¶ 44] The third factor asks whether the obligation to register according to SORNA is triggered only on a finding of *scienter*. *Mendoza–Martinez*, 372 U.S. at 168, 83 S.Ct. 554. In *Haskell* we concluded that it is not and that this factor supports SORNA being viewed as non-punitive. 2001 ME 154, ¶ 17, 784 A.2d at 12.

### d. Traditional Aims of Punishment

[¶ 45] The fourth factor requires consideration of whether SORNA of 1999 promotes retribution and deterrence, the traditional aims of punishment. *Mendoza–Martinez*, 372 U.S. at 168, 83 S.Ct. 554. The Supreme Court in *Smith* found that Alaska's statute was not punitive merely because the statute might deter future crimes, nor was it retributive, even though it was applied based upon the extent of the wrongdoing rather than the extent of the risk posed. 538 U.S. at 102, 123 S.Ct. 1140. Like the Alaska statute considered in *Smith*, Maine's SORNA of 1999 "differentiates between individuals convicted of aggravated or multiple offenses and those convicted of a single nonaggravated offense." *Id.*; *see* 34-A M.R.S. § 11203(5), (8) (2008). The Court recognized in *Smith* that "[t]he broad categories, however, and

the corresponding length of the reporting requirement, are reasonably related to the danger of recidivism, and this is consistent with the regulatory objective." 538 U.S. at 102, 123 S.Ct. 1140.

[¶ 46] The categories considered in *Smith* are different from those at issue here. Under the Alaska law, Letalien's offense would have required him to register for fifteen years. *See* Alaska Stat. §§ 11.41.436, 12.63.020(2), 12.63.100(6) (LEXIS through 2009 First Special Session). Under SORNA of 1999, Letalien must register for life. The record of this case provides us little basis to assess the reasonableness of this widely disparate treatment and whether Maine's requirement of lifetime registration is reasonably related to the danger of recidivism. We thus treat this factor as neutral on the issue of SORNA of 1999's punitive effect.

### e. Application Only to Criminal Behavior

[¶ 47] The fifth factor requires us to consider whether the behavior to which SORNA applies is already a crime. *Mendoza–Martinez*, 372 U.S. at 168, 83 S.Ct. 554. This factor was addressed only briefly by the majority in *Smith*, which found it to be of little weight in the case. 538 U.S. at 105, 123 S.Ct. 1140. Justice Souter noted in his concurring opinion, however:

> The fact that the [a]ct uses past crime as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on;

---

11. We do not agree with Letalien's assertion that 17-A M.R.S. § 261 (2008), should be analyzed to determine whether it imposes an additional affirmative restraint or disability for purposes of our ex post facto analysis because section 261 is a separate provision of the Maine Criminal Code and is not part of SORNA of 1999. Section 261 prohibits persons who have previously been convicted of certain offenses against a victim under the age of fourteen and who are required to register under SORNA of 1999, from having direct or indirect contact with persons under the age of fourteen. The inclusion of SORNA registration in section 261 is a limitation on the predicate crimes addressed by the statute.

when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones.

*Id.* at 109, 123 S.Ct. 1140.

[¶ 48] Because registration under SORNA of 1999 only applies to offenders who were convicted of specified crimes, does not arise based on individualized assessment of an offender's risk of recidivism, and cannot be waived based on proof that an offender poses little or no risk, SORNA of 1999 applies exclusively to behavior that is already a crime. It is punitive in effect in this respect. *See generally Smith,* 538 U.S. at 112–13, 123 S.Ct. 1140 (Stevens, J., dissenting); *Doe v. Alaska,* 189 P.3d 999, 1015 (Alaska 2008).

### f. Rational Connection to a Non–Punitive Purpose

▮ [¶ 49] Next, we consider the sixth factor—whether SORNA of 1999 has a rational connection to a non-punitive purpose. *Mendoza–Martinez,* 372 U.S. at 168–69, 83 S.Ct. 554. As was the case in *Smith,* SORNA of 1999 was enacted to serve the legitimate non-punitive purpose of public safety. *See Smith,* 538 U.S. at 102–03, 123 S.Ct. 1140; 34–A M.R.S.A. § 11201 (Pamph.1999). The Supreme Court concluded that Alaska's statute was rationally connected to its purpose and narrowly drawn, despite the statute's applicability to all convicted sex offenders as a class, despite the requirement that registrants register for their lifetimes regardless of the duration of the threat posed by any individual registrant, and even though it placed no limits on who had access to the information on the sex offender registry. *Id.* at 90, 103–05, 123 S.Ct. 1140.

[¶ 50] There is no doubt that SORNA of 1999 serves a valid governmental pur-

pose separate from punishment. The Legislature declared that SORNA of 1999 is intended "to protect the public from potentially dangerous registrants by enhancing access to information concerning those registrants." 34–A M.R.S. § 11201 (2008). Protecting the public from potentially dangerous sex offenders is, without question, a compelling state interest in furtherance of the state's police powers. Among the fundamental natural rights recognized by the Maine Constitution is the right of all people to "pursu[e] and obtain[ ] safety and happiness." Me. Const. art. I, § 1. The protection advanced by SORNA is among the most basic obligations state government owes its people—ensuring their safety. In accord with the sixth *Mendoza–Martinez* factor, SORNA of 1999 has a rational connection to a non-punitive purpose.

### g. Excessiveness

[¶ 51] The seventh factor addresses whether SORNA of 1999 "appears excessive in relation to the alternative purpose assigned." *Mendoza–Martinez,* 372 U.S. at 169, 83 S.Ct. 554. In *Smith,* the Supreme Court described excessiveness in the following terms:

The excessiveness inquiry of our *ex post facto* jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective.

538 U.S. at 105, 123 S.Ct. 1140. Reasonableness is an objective standard. We analyze excessiveness in this case as it relates to the increased burdens resulting from SORNA of 1999's retroactive application to individuals who were originally subject to a fifteen-year registration period under SORA of 1991 or SORNA of 1995,

but who are now subject to lifetime registration and quarterly in-person verification.

[¶ 52] To determine reasonableness, we rely on the record before us, the authorities cited by the parties and amicus curiae, the published decisions of other courts, and common sense. From these sources, we find insufficient information with which to gauge whether the regulatory means chosen—in particular, increasing the registration period from fifteen years to life without the possibility of a waiver, and increasing the verification from infrequent notices to quarterly in-person reporting and fingerprinting at a police station—are reasonable in light of the law's non-punitive purpose. In *Smith*, the Supreme Court found the durational requirements of the Alaska law were reasonably related to the danger of recidivism and, therefore, were not excessive. 538 U.S. at 104, 123 S.Ct. 1140. However, under the Alaska statute considered in that case, Letalien would have been required to report for fifteen years, not for life, and, after his initial registration, his verification would have been in writing on an annual basis.[12] *See* 538 U.S. at 90, 101, 123 S.Ct. 1140; *see also* Alaska Stat. §§ 12.63.010(d)(1), 12.63.020(2) (LEXIS through 2009 First Special Session). We are left uncertain as to whether the vastly longer degree of regulation of registered offenders such as

Letalien required by SORNA of 1999 is reasonable.[13] What is more certain is the substantial impact that this change will have, first on the lives of the affected offenders, and second, on public safety.

[¶ 53] First, regarding SORNA of 1999's impact on registered offenders, although the law disseminates truthful information, much of which may be otherwise available to the public through far less accessible means, many of the persons included in the registry may no longer pose a danger to the public. One of the primary objectives of criminal sentencing is the rehabilitation of the offender, 17–A M.R.S. § 1151(1) (2008). No statistics have been offered to suggest that every registered offender or a substantial majority of the registered offenders will pose a substantial risk of re-offending long after they have completed their sentences and probation, including any required treatment. The registry, however, makes no such distinctions. For the public, the substantiality of the risk every registrant poses is suggested by the government's initiative in establishing the registration, verification, and community notification requirements in the first place. All registrants, including those who have successfully rehabilitated, will naturally be viewed as potentially dangerous persons by their neighbors, co-workers, and the larger community.[14] It is unknown to what extent this reality will impair the op-

---

12. Under federal law, as a tier II sex offender, Letalien would have been subject to a twenty-five-year registration period and in-person verification every six months, and would not be eligible for a waiver or reduction. *See* 42 U.S.C.S. §§ 16915, 16916 (2008).

13. In *Smith*, the majority opinion cited empirical research regarding the duration of the risk of recidivism, noting that, " 'contrary to conventional wisdom, most reoffenses do not occur within the first several years after release,' but may occur 'as late as 20 years following release.' National Institute of Justice, R. Prentky, R. Knight, & A. Lee, U.S.

Dept. of Justice, Child Sexual Molestation: Research Issues 14(1997).' " 538 U.S. at 104, 123 S.Ct. 1140.

14. As one commentator has explained:

[W]hile registries do disseminate "accurate information" otherwise available to the public, albeit in disaggregated form, the context in which the information is provided is far from neutral. The government's singling out of certain individuals, yet not others, combined with "legislative findings" that those targeted pose particular risk, and sobriquets such as "predatory sex offend-

portunity for rehabilitated offenders to reintegrate and become productive members of society.

[¶ 54] Second, the over-inclusive aspect of the registration requirement has a corresponding positive benefit in that it assures that the public has ready access to information for a longer period regarding a group of individuals who, at least as a class of persons, pose a public safety risk. Even in the absence of individualized risk assessments of registrants, information concerning the conviction history and current whereabouts of every sex offender benefits public safety.

[¶ 55] Although we lean toward the view that the increased regulatory scheme of SORNA of 1999 appears excessive when applied to registered offenders previously made subject to SORA of 1991 or SORNA of 1995 because there is no consideration of the individual circumstances or rehabilitation of each offender, we are left uncertain. Accordingly, we treat this factor as neutral.

6. Evaluation of *Mendoza–Martinez* Factors

 [¶ 56] It is not our role to ask whether the Legislature could achieve its goals through alternative means. Indeed, we properly exercise restraint in our review of a legislative effort to apply retroactively a civil regulatory scheme intended to address a complex public safety issue. We proceed with care so as not to interfere with innovative legislative efforts intended to advance the public interest, unless required otherwise by constitutional mandates.[15]

[¶ 57] Although the ex post facto evaluation in this case raises numerous questions, many of which do not lend themselves to precise answers, ultimately we must determine only whether the punitive effects of SORNA of 1999 negate its civil intent by the "clearest proof." Although we have considered all of the *Mendoza–Martinez* factors and related information in this analysis, the first and second factors, considered together, stand out as being most probative on the question of punitive effects.

[¶ 58] As to the first factor, it belies common sense to suggest that a newly imposed lifetime obligation to report to a police station every ninety days to verify one's identification, residence, and school,

---

er," "sexually violent predator" or "habitual sex offender," contradict government neutrality. Even in jurisdictions that classify registrants in terms of risk, . . . each level carries a corresponding degree of disclosure and opprobrium, and hence community disdain. To conclude that registries only contain "accurate information" is to thus misstate the government's action; a wholly stigmatizing and unwelcome public status is being communicated, not mere neutral government-held information.
Wayne A. Logan, Knowledge as Power: Criminal Registration and Community Notification Laws in America 138 (Stanford Univ. Press 2009).

15. Justice Louis Brandeis famously wrote in this regard:

To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. This Court has the power to prevent an experiment. . . . But in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles. If we would guide by the light of reason, we must let our minds be bold.
*New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting).

and to submit to fingerprinting and provide a current photograph, is not a substantial disability or restraint on the free exercise of individual liberty. As to the second factor, the duty to register imposed by SORA of 1991 and SORNA of 1995 was an integral part of the criminal sentencing process and the resulting sentence. The retroactive application of SORNA of 1999 thus imposes a substantial disability or restraint and, in so doing, makes more burdensome the registration requirements that resulted from an offender's original sentence.

[¶ 59] Regarding the second *Mendoza–Martinez* factor—whether the effects of SORNA of 1999 can be historically regarded as punishment—the State properly notes that in *Haskell,* we determined that the retroactive application of SORNA of 1999 to a crime that was committed on August 8, 1999, did not violate the ex post facto prohibition. 2001 ME 154, ¶¶ 6, 22, 784 A.2d at 8, 16. *Haskell* is, however, distinguishable from this case in one important respect.

[¶ 60] SORNA of 1999 became effective only six weeks after Haskell had committed his crime, but well before his sentencing. *Id.* ¶¶ 2, 6, 784 A.2d at 6, 8. Accordingly, we did not have reason in *Haskell* to consider the question we face today: Whether it is an ex post facto violation to apply retroactively the enhanced requirements of SORNA of 1999 when, by so doing, the application revises and enhances sex offender registration requirements that were a part of the offender's original sentence. This question was also not addressed in *Smith;* the retroactive application of the Alaska statute at issue did not revise and enhance registration require-

ments that were part of the offenders' actual underlying criminal sentences.[16] *See* 538 U.S. at 91, 123 S.Ct. 1140.

[¶ 61] We recognized the significance of the inclusion of compliance with SORNA of 1999 as part of an offender's criminal sentence in *Johnson.* We held that if SORNA of 1999 registration was made a part of a criminal sentence, the exclusive means by which the State could seek to modify the offender's sex offender classification under SORNA of 1999 was through Rule 35 of the Maine Rules of Criminal Procedure. *Johnson,* 2006 ME 35, ¶¶ 13–14, 894 A.2d at 492–93. We also indicated that the same was not true, however, for offenders sentenced on or after July 30, 2004, whose sex offender registration requirement was separately ordered and not part of the underlying sentence, in accordance with the 2003 amendment of SORNA of 1999. *Id.* ¶ 14, 894 A.2d at 492–93; *see also* P.L. 2003, ch. 711, § B–13 (effective July 30, 2004). It follows from *Johnson* that when sex offender registration is made a part of an offender's criminal sentence, it necessarily constitutes a part of the punishment administered by the State in response to that offender's criminal conviction. There is an unmistakable nexus between the retroactive application of SORNA of 1999, on the one hand, and the punishment of those for whom registration as a sex offender under SORA of 1991 and SORNA of 1995 was a part of their original criminal sentences. We thus distinguish our analysis in this case from that in *Haskell* because the purpose of the ex post facto prohibition is rightfully considered to be at its apex when a law's retroactive application is more punitive than the pun-

16. Shortly after *Smith* was decided, the Alaska Court of Appeals ruled that sex offender registration was regulatory and not part of a defendant's sentence because "[a] sentencing court has no power to exempt a defendant from the requirements of the [a]ct." *Herreid v. Alaska,* 69 P.3d 507, 508 (Alaska Ct.App. 2003).

ishment that was actually imposed against an offender as part of a sentence.

[¶ 62] Having considered all of the *Mendoza–Martinez* factors, we are convinced that an ex post facto violation has been shown by the clearest proof. Specifically, we hold that the retroactive application of the lifetime registration requirement and quarterly in-person verification procedures of SORNA of 1999 to offenders originally sentenced subject to SORA of 1991 and SORNA of 1995, without, at a minimum, affording those offenders any opportunity to ever be relieved of the duty as was permitted under those laws, is punitive. As to these offenders, the retroactive application of SORNA of 1999 is an unconstitutional ex post facto law because it "makes more burdensome the punishment for a crime after its commission." [17] *Collins,* 497 U.S. at 42, 110 S.Ct. 2715 (quotation marks omitted); *see also Chapman,* 685 A.2d at 424; *Joubert,* 603 A.2d at 869.

### 7. Conclusion

[¶ 63] To summarize, we conclude:

(1) For ex post facto purposes, SORNA of 1999 is properly evaluated on its face, and not in relation to how it has been applied against any individuals. Our suggestion to the contrary in *Doe v. District Attorney,* 2007 ME 139, 932 A.2d 552, is overruled.

(2) The prohibition on ex post facto laws in the Maine Constitution, Me. Const. art. I, § 11, is coextensive with the corresponding prohibition in the United States Constitution, U.S. Const. art. I, § 10, cl. 1.

(3) The retroactive application of the lifetime registration requirement and quarterly in-person verification procedures of SORNA of 1999 to offenders originally sentenced subject to SORA of 1991 and SORNA of 1995, without, at a minimum, affording those offenders any opportunity to ever be relieved of the duty as was permitted under those laws, is, by the clearest proof, punitive, and violates the Maine and United States Constitutions' prohibitions against ex post facto laws.

[¶ 64] Because the Legislature, in its upcoming session, may wish to consider revisions to SORNA of 1999 to address the registration of offenders originally sentenced subject to SORA of 1991 and SORNA of 1995, we postpone the effective date of our mandate to March 31, 2010. *See* M.R.App. P. 14(c).

The entry is:

Judgment affirmed. Mandate to issue March 31, 2010.

SILVER, J., concurring.

[¶ 65] I concur in the result but I conclude that the Maine Constitution provides a higher level of protection against ex post facto laws than the United States Constitution.[18] I therefore believe that

---

17. Because our decision is based to a substantial degree on the unique of history of Maine's sex offender registration laws and sentencing practices, we do not decide today the extent to which it applies to persons sentenced in jurisdictions other than Maine on or after June 30, 1992, and before September 18, 1999, who are required to register in Maine in accordance with SORNA of 1999.

18. Although Maine apparently has yet to implement the current version of the Federal SORNA, 42 U.S.C.S. §§ 16901–16929 (Lexis-Nexis 2008 & Supp.2009), that Act provides:

When evaluating whether a jurisdiction has substantially implemented this title, the Attorney General shall consider whether the jurisdiction is unable to substantially implement this title because of a demonstrated inability to implement certain provisions that would place the jurisdiction in violation of its constitution, as determined by a ruling of the jurisdiction's highest court.

the Court's decision should be based on the Maine Constitution, independent of the United States Constitution. I also conclude that some of the additional registration burdens promote retribution and deterrence, are excessive, and impose a stigma, and should be held unconstitutional under Maine's ex post facto clause on these additional grounds.

## I. THE MAINE CONSTITUTION

[¶ 66] The Maine Constitution provides an independent basis for decision. We interpret the Maine Constitution independently of the Federal and have the authority to interpret language in the Maine Constitution as providing more protection to our residents than similar or identical language in the Federal Constitution. *See State v. Caouette*, 446 A.2d 1120, 1122 (Me. 1982) ("[F]ederal decisions do not serve to establish the complete statement of controlling law but rather to delineate a constitutional minimum...."). The United States Supreme Court has long held that, despite its interpretation of federal constitutional provisions, "the States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake." *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Thus, the Federal Constitution prescribes the minimum mandatory constitutional standards that states must afford their citizens. *State v. Collins*, 297 A.2d 620, 626 (Me.1972).

[¶ 67] Consistent with this discussion in *Lego*, we held in *Collins* that the Maine Constitution provides greater protection to its citizens than the Federal Constitution in adopting a higher standard of proof

necessary to establish the voluntariness of a confession because the value expressed in the provision "has been endowed with the highest priority by being embodied in a constitutional guarantee." *Id.*; *State v. Rees*, 2000 ME 55, ¶ 8, 748 A.2d 976, 979. Similarly, in *Caouette*, we interpreted more broadly than the United States Supreme Court the constitutional requirement that statements made by a defendant be voluntary. 446 A.2d at 1122–23. More recently, in *Rees*, we discussed that "a more protective standard [for suppressing a defendant's statements] is warranted under Maine law." 2000 ME 55, ¶ 9, 748 A.2d at 979.

[¶ 68] Other states have held that sex offender registration laws violate the ex post facto clauses of their state constitutions even in circumstances in which they would not violate the Federal Constitution. For example, in a state law challenge following the United States Supreme Court decision in *Smith v. Doe*, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), the Alaska Supreme Court applied the federal "intent-effects" test,[19] but found that the Alaska sex offender registration law violated the state constitution, which is more protective than the Federal despite the use of similar language. *Doe v. Alaska*, 189 P.3d 999, 1003, 1007, 1019 (Alaska 2008). The Indiana Supreme Court as well held that a sex offender registration act was unconstitutional under the state constitution as applied to the defendant, even when using the federal test. *See Wallace v. Indiana*, 905 N.E.2d 371, 378 (Ind.2009).

[¶ 69] Here, we have reason to apply a higher standard. The location of the ex post facto clauses within the broader con-

---

42 U.S.C.S. § 16925(b)(1) (LexisNexis 2008).

19. Assuming, without finding, that the state's legislature intended the Alaska sex offender registration act to be non-punitive, the court

resolved the issues applying the "effects" portion of the test. *Doe v. Alaska*, 189 P.3d 999, 1007–08 (Alaska 2008).

stitutional schemes of the Maine and United States Constitutions indicates their unique underlying purposes. Maine's ex post facto clause is found not in article IV, which sets out the powers of the Legislature, but is instead found in article I, which declares the personal rights of Maine's citizens. *See* Me. Const. art. I, § 11. By contrast, the Federal Ex Post Facto Clause is found not in the Bill of Rights, which enumerates citizens' federal personal rights, but rather in article I, section 9, which describes the powers and limitations of the legislative branch of the federal government. *See* U.S. Const. art. I, § 9, cl. 3.

[¶ 70] The location of a provision within a constitution bears as much significance as the provision's text itself. Chief Justice Marshall recognized this point when construing the Necessary and Proper Clause in *McCulloch v. Maryland*, 4 Wheat. 316, 17 U.S. 316, 419–20, 4 L.Ed. 579 (1819). Rebuffing Maryland's argument that the clause limited Congress's power to enact legislation, the Chief Justice deftly pointed to the clause's placement "among the powers of Congress, not among the limitations on those powers." *Id.* at 419. Had the framers intended "by this clause, to restrain the free use of means which might otherwise have been implied, that intention would have been *inserted in another place.*" *Id.* at 420 (emphasis added).

[¶ 71] The respective placements of the ex post facto clauses in the federal and state constitutional schemes indicate that the Maine Constitution, unlike its federal counterpart, declares that the right to be free of ex post facto laws is a personal right, and not simply a limitation of legislative power, as it is in the United States Constitution. *See* Laurence H. Tribe, American Constitutional Law § 1–13 at 41–42 (3d ed. 2000) (stating that "when the *text* [of the Constitution] is silent or am-

biguous ... [courts often must] rely 'on notions of a constitutional plan—the implicit ordering of relationships within the [governmental] system,'" and explaining that "'[t]he tacit postulates yielded by that ordering are as much engrained in the fabric of the document as its express provisions, because without them the Constitution is denied force and often meaning'" (quoting *Nevada v. Hall*, 440 U.S. 410, 433, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979) (Rehnquist, J., dissenting))). Because of this difference, we should analyze the Sex Offender Registration and Notification Act of 1999, 34–A M.R.S. §§ 11201–11256 (2008), under the Maine Constitution, acknowledging its greater protection to this personal right.

[¶ 72] One of the greater protections afforded by our Constitution should be a standard of proof that is not as onerous as the "clearest proof" standard, which is both unnecessary and excessive when applying the ex post facto clause of the Maine Constitution. The Supreme Court's standard requiring the "clearest proof" to find a statute that is intended to be civil to instead be an ex post facto law is not controlling. *See Caouette*, 446 A.2d at 1122; *Collins*, 297 A.2d at 626–27. Instead, pursuant to well-established jurisprudence in this State, any constitutional challenge to a statute is subject to the presumption that the statute is constitutional. *State v. Falcone*, 2006 ME 90, ¶ 5, 902 A.2d 141, 142. We need not employ a more onerous standard under the Maine Constitution. I would follow the Alaska Supreme Court in adhering to the "presumption of constitutionality" approach, and not impose "a heightened presumption requiring 'clearest proof' ... [which] could threaten rights protected by [our State] Constitution and might be inconsistent with the responsibilities of this court." *Doe*, 189 P.3d at 1008 n. 62.

## II. THE *MENDOZA–MARTINEZ* FACTORS[20]

### A. SORNA of 1999 Imposes a More Burdensome Punishment Regardless of Whether it is Included in the Sentencing Statute

[¶ 73] I agree with the majority that if a law establishes a more burdensome punishment and applies it retroactively, it makes no difference whether that burden is labeled "civil" or "criminal" or whether the burden is characterized as "remedial" or "punitive." *See Collins v. Youngblood,* 497 U.S. 37, 46, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (holding that labeling a law as procedural does not immunize it from scrutiny for an ex post facto violation). For this reason, I disagree with the Court's suggestion, set forth in its discussion of the *Mendoza–Martinez* factors, that a distinction should be drawn between a burden imposed as part of a sentence and one imposed as a regulatory requirement parallel to sentencing.

[¶ 74] As the Court notes, the statutory history reflects that, beginning in 1996, the SORNA of 1995 registration requirements were imposed as part of a sentence. P.L. 1995, ch. 680, § 4 (effective July 4, 1996) (codified at 17–A M.R.S.A. § 1152(2–C) (Supp.1996)). The statute at that time stated that "[a]s part of a sentence, the court shall order" convicted offenders to register. 17–A M.R.S.A. § 1152(2–C) (Supp.1996). In 2003, the statute was amended to state that "[a]t the time the court imposes a sentence, the court shall order" convicted offenders to register. P.L. 2003, ch. 711, § B–13 (effective July 30, 2004) (codified at 17–A M.R.S.A. § 1152(2–C) (Supp.2004)). That SORNA requirements were historically part of the sentencing process, beginning in 1996, indicates that SORNA of 1999 is punitive, as the majority holds, but it is also important to note that the 2003 amendment did not, in itself, make the registration requirements less punitive or otherwise remove the constitutional infirmity.

### B. SORNA of 1999 Promotes Retribution and Deterrence

[¶ 75] Unlike the majority, I would conclude that SORNA of 1999 does promote retribution and deterrence. As the Indiana Supreme Court recently said in its discussion of that state's sex offender registration act:

It is true that to some extent the deterrent effect of the registration and notification provisions of the Act is merely incidental to its regulatory function. And we have no reason to believe the Legislature passed the Act for purposes of retribution—vengeance for its own sake. Nonetheless it strains credulity to suppose that the Act's deterrent effect is not substantial, or that the Act does not promote community condemnation of the offender, both of which are included in the traditional aims of punishment.

*Wallace,* 905 N.E.2d at 382 (quotation marks and citations omitted). Even if one accepts the premise that publicly labeling individuals as violent sexual predators is not in any way intended as retribution for their crimes, SORNA of 1999 has had this effect. It promotes community condemnation in its most extreme form: vigilantism. Two Maine men were murdered after their names were found on the Maine Sex Offender Registry. *See Doe v. District Attorney,* 2007 ME 139, ¶ 56 n. 21, 932 A.2d 552, 568 (Alexander, and Silver, JJ., con-

---

20. *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).

curring). This factor, therefore, suggests that the SORNA of 1999 registration requirements have a punitive effect.

## C. SORNA of 1999 is Excessive in Relation to its Non–Punitive Purpose

[¶ 76] Despite the assuredly well-intentioned actions of the Legislature, the expansion of SORNA in 2001 to include all persons convicted of sex offenses on or after June 30, 1992, *see* P.L. 2001, ch. 439, § OOO–7 (effective Sept. 21, 2001) (codified at 34–A M.R.S.A. § 11202 (Pamph. 2001)), is not a reasonable means to protect the public from sex offenders. SORNA of 1999, which is "a continuing, intrusive, and humiliating regulation of the person himself," *see Doe v. Sex Offender Registry Bd.*, 450 Mass. 780, 882 N.E.2d 298, 308 (2008) (quotation marks omitted) (discussing Massachusetts statute), currently contains no provision allowing for a waiver of its requirements; a waiver provision was enacted, *see* P.L. 1995, ch. 680, § 13 (effective July 4, 1996) (codified at 34–A M.R.S.A. § 11121 (Supp.1996)), but later repealed, *see* P.L. 2001, ch. 439, § OOO–5 (effective Sept 21, 2001) (codified at 34–A M.R.S.A. § 11121 (Pamph. 2001)). SORNA of 1999 is mandatory and attaches to all convictions specified by statute. 34–A M.R.S. § 11203(5)-(8)(2008).

[¶ 77] Although requiring persons sentenced for sex offenses from June 30, 1992 through September 17, 1999, *see* 34–A M.R.S. § 11222(2–A) (2008),[21] to submit to inclusion on the registry does provide the public with information about where these individuals live and work, *see* 34–A M.R.S. § 11221(1)(A), (B) (2008), the catch-all scope of the statute's application dilutes its utility. Given the wide range of acts committed by those individuals, the registry does not allow the public to distinguish between individuals like Letalien, who have been evaluated by a clinical and forensic psychologist and determined to be at the lowest risk of reoffending, and those individuals who committed multiple crimes; victimized infants and toddlers; and tortured, maimed, or killed their victims. Because the application of SORNA of 1999 is not tied to the relative public safety risk presented by the particular registrants and is excessive with respect to the purpose for which it was enacted, its effects are more punitive than regulatory.

## III. ADDITIONAL FACTOR OF STIGMA

[¶ 78] In addition to the *Mendoza–Martinez* factors, 372 U.S. at 168–69, 83 S.Ct. 554, the Court should also consider the additional factor of stigma, consistent with the Court's prior decisions. In *State v. Freeman*, 487 A.2d 1175 (Me.1985), this Court held that a civil drunk driving law was determined to have sufficient criminal characteristics to require constitutional safeguards; that civil law was deemed void, however, because a complementary criminal drunk driving law was already in effect. *Id.* at 1176–80. The Court recognized that the resulting stigma was "highly suggestive of the true criminal nature of the procedure." *Id.* at 1178. In contrast, in *State v. Anton*, 463 A.2d 703 (Me.1983), it was the absence of stigma attached to traffic offenses that led, in part, to the Court's determination that there was no right to a jury trial in a case involving those charges. *Id.* at 708. Regarding Letalien, the stigma is due in part to the offense itself, but the magnitude of the effects of the stigma are indisputably

---

21. Another provision applies to persons sentenced from 1982 to 1992. *See* 34–A M.R.S. § 11222(2–C) (2008).

heightened with Internet publication. The stigma renders SORNA of 1999 punitive.

[¶ 79] In conclusion, because SORNA of 1999 is punitive and operates retroactively, I would hold that its application violates the ex post facto clause of the Maine Constitution independent of the protections afforded by the United States Constitution.